UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

A.T., a minor, by and through his
parent and natural guardian Sha-
keema Tillman; B.C., a minor, by and
through Kristi Cochardo; on behalf of
themselves and all others similarly
situated,

                    Plaintiffs,

        v.

DAVID HARDER, Broome County Sheriff,
in his official capacity; MARK
SMOLINSKY, Jail Administrator of the
Broome County Correctional Facility, in his
official capacity; KEVIN MOORE, Deputy
Administrator, in his official capacity;
CHENANGO VALLEY CENTRAL
SCHOOL DISTRICT.

                    Defendants.

------------------------------------------------------ x

**CLASS ACTION FIRST
AMENDED COMPLAINT**

17-CV-0817(TJM)(DEP)

## PRELIMINARY STATEMENT

1.    This class-action civil-rights lawsuit challenges the solitary

confinement of 16- and 17-year-olds, most of whom have not been convicted of any

crime, at the Broome County Correctional Facility ("Broome County Jail" or "the

Jail"). Despite an emerging consensus that solitary confinement places juveniles at

risk of serious harm-including suicide, psychosis, and post-traumatic stress disorder- and despite a national abandonment of solitary confinement of juveniles, the Broome County Sheriff's Office has embraced the frequent and arbitrary use of solitary confinement. As the Sheriff's Office is well aware, these practices are exposing the young people held at the Jail to serious harm. Compounding the profound consequences of the Office's wanton use of solitary confinement, Sheriff's Office officials also are denying juveniles basic educational services and denying students with disabilities access to special education supports and services.

2.     At the Broome County Jail, juveniles are routinely confined to small cells – some no larger than 8' x 10' -- for 23 hours a day, for weeks and even months on end. These children, many already suffering from mental disabilities, have little to nothing to do in their cells: no meaningful human interaction, no education or programming, no music or television, and limited reading materials. Juveniles who reach their breaking point and want to kill themselves are stripped naked and put in a "suicide cell" until they are no longer suicidal and then returned right back to those same conditions to continue their punishment.

3.     The juveniles are at most given one hour each day for "recreation", which might take place in an empty, cement-enclosed "yard."  The juveniles' recreation time in the Jail's Special Housing Unit ("SHU") gives them little respite from the harms they face isolated in their cells.  Juveniles are shackled for their first week of recreation in the SHU and for additional weeks as a punishment if

they are found misbehaving in the SHU. They are also given recreation time with adult inmates who harass, instigate, and physically assault them.

4.      The Sheriff's Office is imposing solitary confinement for minor misbehavior that is not unusual for teenagers, especially those with mental health disabilities.  Juveniles have been placed in isolation for horseplay, speaking loudly, failing to clean their cells and even playing with snow.

5.      Potentially dangerous for anyone, solitary confinement can be especially harmful for juveniles, who still are developing physically, psychologically, and socially. Isolating children for 23 hours a day can cause trauma, depression, anxiety, and psychosis, increase the risk of suicide and self-harm, and permanently interfere with a child's psychological and social development.  For juveniles with mental illnesses or disabilities, the risk of harm from isolation is even greater because those illnesses or disabilities can worsen.

6.      Not only is it harmful to deprive a child of meaningful social interaction or mental stimulation, it also is counterproductive to the goals of ensuring safety, security, and good order.  Research shows that isolating children results in increased agitation and an increased risk of misbehavior.  Correctional facilities that have reduced their reliance on disciplinary isolation for juveniles have seen reductions in rates of violence and misbehavior.  At most, these facilities allow for short-term confinement—measured in *hours*, not days, weeks, or months—as a last resort when other options fail to diffuse situations which pose an acute risk of harm to the juvenile or others,

7.      Adding to the harm being inflicted on juveniles detained at the Broome County Jail by solitary confinement is the routine practice of denying these children basic educational services. No juvenile in isolation receives regular educational instruction and oftentimes they receive only a packet of worksheets to complete in their cell. These cell packets are no substitute for the classroom and are particularly inappropriate and damaging for juveniles with special education needs.

8.      The Defendants have violated and continue to violate the Plaintiffs' rights under the Fourteenth Amendment and Eighth Amendment of the U.S. Constitution, Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504), and the Individuals with Disabilities Education Act.  The plaintiffs seek declaratory and injunctive relief that will end the inhumane policies and practices inside the Broome County Jail.

## <u>PARTIES</u>

**The Named Plaintiffs**

9.      A.T. is an African-American 17-year-old boy detained at the Jail, where he is currently in solitary confinement. A.T. has received at least 15 different disciplinary isolation sanctions and has served over one hundred days in solitary confinement.  He appears in this action through his mother and guardian Sha-keema Tillman.

10.     B.C. is a Caucasian 17-year-old boy detained at the Jail, where he is currently in solitary confinement. B.C. has received at least 10 different isolation

sanctions and has served over one hundred and fifty days in solitary confinement. He appears in this action through his mother and guardian Kristi Cochardo.

**The Defendants**

11.     David Harder is the Sheriff of Broome County and head of the Broome County Sheriff's Office, an administrative arm of Broome County.  The Custody Department of the Sheriff's Office manages the Broome County Correctional Facility, a jail located in Dickinson, New York.  The Custody Department receives federal funding.  Sheriff Harder has final policy-making authority for Broome County for all policies that govern the Jail.  Sheriff Harder also has supervisory authority over the Jail, and is personally involved in authorizing and maintaining the unconstitutional policies and customs challenged by Plaintiffs.  Sheriff Harder is sued in his official capacity. The Broome County Jail receives federal financial assistance and is a public entity within the meaning of Title II of the ADA.

12.     Mark Smolinsky is the Chief Jail Administrator for the Broome County Sheriff's Office.  Major Smolinsky is responsible for the management of the Broome County Jail, and is personally involved in authorizing, maintaining, and enforcing the unconstitutional policies and customs challenged by Plaintiffs.  Major Smolinsky is sued in his official capacity.

13.     Kevin Moore is the Deputy Jail Administrator for the Broome County Sheriff's Office.  Captain Moore is responsible for the management of the Broome County Jail, and is personally involved in authorizing, maintaining, and enforcing

the unconstitutional policies and customs challenged by Plaintiffs.  Captain Moore is sued in his official capacity.

14.    The Chenango Valley Central School District is the public school district for the town of Dickinson, where the Broome County Jail is located.  It is the educational provider for incarcerated individuals at the Jail.  The District receives federal financial assistance.

## FACTS

### Solitary Confinement at the Broome County Jail

15.    Located in Dickinson, New York, the Broome County Jail is a 563-bed correctional facility that houses pre-trial detainees, sentenced individuals, and technical parole violators.  It is overseen by defendant Broome County Sheriff David Harder, with defendants Major Smolinsky and Captain Moore having day-to-day responsibility for the facility.

16.    At the Broome County Jail, normal out of cell time for juveniles is approximately 12 hours a day.  That time is used for recreation, showers, accessing the library, and during weekdays, attending GED educational classes, other programs such as anger management and life skills.

17.    The Broome County Jail's disciplinary policies and practices draw no distinctions between adults and juveniles and authorize the isolation of a juvenile for *any* rule violation. For any alleged violation juveniles may be immediately "keep-locked" to their cells in the juvenile unit or, pending a disciplinary hearing, confined in "administrative segregation" for up to 15 business days after which they may be

sentenced to additional "punitive segregation."  Administrative segregation and punitive segregation can be served in the Jail's "Special Housing Unit" ("SHU"), commonly referred to by inmates as "the Box," or in the Jail's juvenile unit cells in "keep-lock."

18.    The Sheriff's policy gives their staff wide discretion to decide whether isolation is an appropriate punishment and whether it should be served in lock-in or the SHU.  Whether the Sheriff's Office labels it "keep-lock," "protective custody", "punitive segregation," or "administrative segregation," and whether served in the SHU or in their own cell, it is solitary confinement: 23 hours a day of isolation with no meaningful social interaction, environmental stimulation, or human contact.

19.    The Jail's SHU consists of approximately 32 cells arranged on two floors and houses adults and juveniles alike. A typical cell no larger than 8' x 10' and contains a stainless steel toilet, sink, a small metal desk, an overheard fluorescent light and a small plexiglass window. The cell is entered through a large metal door which swings out. The door has a small plexiglass window about nose height and a metal panel slot that can only be unlocked from outside the cell through which food trays are passed.  The cells have no phones, radios, or televisions.

20.    Juveniles in the Jail's SHU cells are locked in their cells for weeks on end with little to no out-of-cell time.  They are taken out of their cells for one hour of so called "recreation" and a 10 minute shower every other day.  Recreation time is

at different times every day so juveniles are routinely held in their cell for over 24 hours until they receive their one hour of recreation.

21.     Juveniles locked in SHU cells have virtually no meaningful human interaction. The only avenues of communication for juveniles is to speak through vents in their cells, or yell loudly enough for people to hear through the cell walls and doors. Juveniles are often reprimanded by corrections officers for attempting to speak with other detainees locked in the SHU.

22.     Interactions with Jail staff is limited because corrections officers remain in their office area, which inmates call "the bubble", only to emerge for their required obligations, like feeding the juveniles.  Nurses come three times a day to pass out medication but do not check on the mental health status of the juveniles. Nobody from mental health checks on the juveniles while they are in the SHU.

23.     Nearly every aspect of the SHU is dehumanizing.  When juveniles are first brought to the SHU, they are strip searched and their personal property taken from them.  For the first three days in the SHU they are allowed only one religious book. If they do not have a religious book they are left with nothing to do but sit and think. The Sheriff's Office shackles the juveniles almost every time they have contact with corrections officers outside of their cells. When they are not handcuffed they are followed closely by two to three large corrections officers.

24.     The cells in which they spend all of their time have the odor of feces and urine and are riddled with graffiti.  Juveniles regularly see adult inmates throw

urine on other inmates or guards and sometimes fall victim to the attacks themselves.

26.   When family visits occur, the Sheriff's Defendants limit them to a total of two hours each week.

26.   Juveniles' one hour out of their cell for "recreation" consists of being placed in the "yard." The "yard" is entirely enclosed by concrete walls and steel mesh, with no seating, equipment, or activities.

27.   By the Sheriff's Office's policy and practice all new juvenile arrivals at the SHU are placed in mechanical restraints for one week during their one hour of recreation.  They are shackled around the waist, wrist, and ankles, making movement and exercise difficult. Juveniles are regularly placed in mechanical restraints during recreation as a punishment for violating facility rules while in the SHU.  It is not uncommon for a juvenile to spend their recreation time in shackles for more than one week. When they are not shackled, juveniles pace, or do pushups on the hard concrete floor to pass the time.

28.   Adults are on the "yard" during the juveniles' recreation time.  As a result of this co-mingling, juveniles are often threatened and involved in fights with adults during their recreation time. Due to fear of altercations juveniles sometimes forego their sole hour out of their cells because they fear the prospect of fighting or suffering further abuse at the hands of an adult inmate.

29.     Night time rarely provides a respite from the dehumanizing conditions. The juveniles frequently have difficulty sleeping at night.  Adults keep them awake by shouting their plans to attack them during recreation time.

30.     The SHU is not just for juveniles who break the facilities rules. Juveniles are also housed there as a matter of convenience when they are placed on "protective custody" or when they "exhibit unusual behavior." These juveniles have no special privileges. They suffer the same inhumane conditions and deprivations of their rights as the juveniles who are placed in the SHU as a punishment.

31.     Jail officials also use cells in the Jail's separate juvenile unit for disciplinary isolation.  These cells are virtually identical to the SHU cells. Juveniles confined to them suffer the same deprivation: 23 hours a day or more locked in a cell with essentially no meaningful human interaction.  Because jail officials also use the juvenile unit to house adults, juveniles in disciplinary isolation in that unit face similar threats from adults like the threats in SHU.

32.     The Sheriff's Defendants, through their policies and practices, are directly responsible for these harsh conditions and the related risk of harm.

### *Juveniles Are More Vulnerable to the Harms of Solitary*

33.     Defined by the National Commission on Correctional Health Care as "the housing of an adult or juvenile with minimal rare meaningful contact with other individuals," solitary confinement can harm both adults and juveniles. Juveniles and adults are fundamentally different. Because juveniles are still

developing psychologically, neurologically, and socially, they are especially susceptible to psychological harm when they are isolated from other people.

34.     Juveniles in isolation face a significant risk of serious mental harm. Solitary confinement negatively impacts juveniles by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior.  Research shows that almost all suicides within juvenile correctional facilities occur when the child is in some type of isolation and that the majority of juveniles who commit suicide had a history of being placed in isolation.

35.     These mental health concerns can cause long-term harm.  Solitary confinement can lead to chronic conditions like depression, which in teenagers can manifest as anger or as self-harm.  In addition, children who experience depression and anxiety in their teenage years are at a higher risk for presenting with these diagnoses again.  Damage associated with low self-esteem, vegetative features, and hopelessness associated with depression can similarly be long standing.  Depression has a 10% to 15% mortality rate associated with it. Solitary confinement increases the risk of suicide substantially compared to the general population.

36.     Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger and hatred.  Unlikely to trust others, juveniles emerging from solitary have trouble forming therapeutic relationships necessary to address mental health concerns resulting from solitary confinement.

37.     Medical research on adolescent brains explains why juveniles are more vulnerable to the risk of long-term harm.  In the adolescent brain, the connections between the frontal lobe and the mid-brain have not fully developed.  If an adolescent is traumatized in certain ways, it can cause permanent changes in brain development and create a higher risk of developing permanent psychiatric conditions like paranoia and anxiety.  Trauma from solitary confinement has a high likelihood of causing these permanent changes.

38.     The risk of harm is made worse by the disproportionately high incidence of preexisting trauma and mental health concerns among juveniles in the criminal justice system.  Research shows that more than 60% of the youth in correctional settings have an underlying major mental illness.  Stress from isolation can compound past trauma and exacerbate mental illnesses and disabilities.  For those juveniles with mental illnesses and disabilities, the risk of harm is especially great. People with mental illnesses and disabilities already have cognitive deficits in their brain structure or biochemistry.  They already have weakened defensive mechanisms, are at a higher risk for further mental health complications, and are more susceptible to significant trauma from isolation. Trauma from isolation will be more long-lasting for those with mental illnesses or disabilities than those without.

39.     The American Medical Association, the American Academy of Child and Adolescent Psychiatry, and the National Commission on Correctional Health Care all have called on correctional facilities to halt the use of solitary confinement of juveniles for disciplinary purposes, otherwise referred to as disciplinary isolation

12

40.     The harm of solitary faced by juveniles in isolation is intensified by placing them in restraints during their one daily hour of recreation, as such restraints are known to cause both physical and psychological harm.

41.     In a series of Eighth Amendment cases involving the death penalty and life without parole sentences, the Supreme Court has held that the Constitution requires that children not be punished like adults without first accounting for the unique traits that make them children.

42.      A number of professional organizations and institutions have echoed the Supreme Court's principle that children cannot be treated like adults.  The National Commission on Correctional Health Care, for example, issued a statement articulating their position that juveniles should not be placed in solitary confinement for any duration and highlighted their particular vulnerability to adverse reactions from isolation.  The World Health Organization, United Nations, and other international bodies have also recognized that solitary confinement is particularly harmful to a child's psychological well-being and cognitive development.  Acknowledging the high risk of mental illness as well as the higher rates of suicide and self-harm for youth in solitary confinement, in 2015 the U.N.'s Special Rapporteur on Torture condemned solitary confinement of children for any duration, calling it torture.

43.     The Juvenile Detention Alternatives Initiative (JDAI), which has developed the most widely recognized set of national best practices on the use of solitary confinement with juvenile populations, provides that solitary confinement

can never be used for purposes of punishment or discipline and must be limited to less than four hours.

44.     States have been banning the use of disciplinary isolation for children held in juvenile detention facilities.  So far, at least twenty-one states have prohibited juvenile detention facilities from using disciplinary isolation for juveniles.

45.     Having recognized in a 2012 report that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement," the U.S. Department of Justice recently prohibited the use of solitary confinement for juveniles in federal prisons.

46.     State and city officials are implementing similar bans in adult jails and prisons.  For example, the Onondaga County Justice Center in Syracuse, New York, pursuant to a 2017 settlement agreement has stopped the use of disciplinary isolation for juveniles held in the facility. At Rikers Island, the second largest jail in the country, the City Corrections Commissioner and Mayor banned the use of solitary confinement for juveniles in 2014. A number of other jurisdictions, including Mississippi and Los Angeles, have also recently adopted reforms that abolish disciplinary or punitive isolation for juveniles.

47.     The recommendations of experts and the actions taken by corrections officials and legislatures show a growing consensus that disciplinary isolation is harmful for juveniles and unnecessary for safety.  Many experts, correction officials, and legislatures agree that when isolation is used it should be for the shortest

period of time necessary to gain control of a security threat, should be under strict controls, and should involve the continual monitoring of the juvenile.

### *The Sheriff's Office is Fully Aware of the Risks of Solitary Confinement and Has Deliberately Chosen to Ignore Those Risks*

48.   By virtue of complaints, internal reports, meetings with advocates, news coverage and a recent policy pronouncement by its own accrediting agency, the Sheriff's Office has been repeatedly put on notice of the substantial right of serious harm posed by its use of solitary confinement.  Notwithstanding this notice, the Sheriff's Office continues its regular use of solitary confinement and ignores the complaints of the juvenile inmates.

49.   The Sheriff's Office is also aware, or should be aware, of the harm inflicted by their use of mechanical restraints as a punishment for juveniles held in solitary confinement.

50.   Staff at the Broome County Jail are required to document and report through the chain of command any inmates who appear to them, or any staff member, to be in need of mental health interventions. Upon information and belief, the Jail's mental health staff informed the Sheriff's Defendants that B.C. may be at risk to commit suicide while in isolation and that mental health removed him from the Box and put in in suicide watch. Nonetheless, once B.C. calmed down, the Sheriff's Defendants returned him to the Box.

51.   Upon information and belief, local advocates met with County Executive Jason Garnar, Sheriff David Harder and Major Mark Smolinsky to warn them about the dangers of solitary confinement for juveniles at the Jail. Upon

information and belief, County Executive Garnar spoke with Sheriff Harder about the Jail's practice of placing juveniles in solitary confinement.

52.     Juveniles routinely try to bring the conditions at the Broome County Jail to the attention of the Sheriff's Office, but the Sheriff's Office has systemically ignored those complaints and even have gone so far as to stonewall the children who try to complain.  The Grievance Coordinator routinely denies juveniles grievance forms to complain about their conditions of confinement.  Their complaints to corrections officers in the SHU or in their housing unit also fall on deaf ears.

53.     In April 2016, one of the organizations that accredits the Broome County Jail—the National Commission on Correctional Health Care (NCCHC) --- adopted a position statement that all juveniles should be excluded from solitary confinement of any duration because isolation is particularly harmful for juveniles. Upon information and belief, the Sheriff's Defendants were made aware of the substantial risk of serious harm that isolation poses to juveniles based on NCCHC's publications.

***The Sheriff's Defendants' Disciplinary Isolation Policies and Practices Discriminate Against Juveniles with Disabilities***

54.     The Sheriff Defendants violate the rights of juveniles with psychiatric and/or intellectual disabilities by housing them in solitary confinement; by failing to accommodate their particular vulnerability to the conditions of solitary confinement; and by denying them access to programs and services because they are housed in solitary confinement based on behaviors related to their disabilities.

55.     At the jail, juveniles with mental health disabilities are disciplined for non-conforming and erratic behaviors related to their conditions, some of which could have been avoided if the Sheriff's Office provided adequate mental health care or accommodations. The harsh conditions and lack of accommodations cause juveniles in isolation to continue and escalate these symptomatic behaviors. In response they are locked in for longer periods of time.

56.     Repeated stints in disciplinary isolation result in repeated denials of education, programming, and services.  Thus, by failing to make reasonable accommodations to their disciplinary policies and practices, the Sheriff's Defendants discriminate against juveniles with mental disabilities.

57.     The Sheriff's Office's policies and procedures, regarding the use of solitary confinement against people with psychiatric and/or intellectual disabilities is a direct violation of the ADA and Section 504 of the Rehabilitation Act.

### Denying Juveniles in Disciplinary Isolation Appropriate Education Under New York State Law Without Due Process

58.     In addition to being placed at risk of serious harm, individuals in isolation are also denied New York state-mandated educational services without due process.

59.     County jails, along with the school district in which the jail is located, must provide educational services to juveniles including, at minimum, three hours of educational instruction.  Only under specific, limited circumstances, and following a detailed process, can this right to instruction be restricted.  Placement in disciplinary isolation, alone, is never a justification for shutting a juvenile out of

the classroom.  Yet, it is the Defendants' policy and practice to deny instruction solely because a juvenile is placed in disciplinary isolation.

60.     The Sheriff's Office's policies bar juveniles in disciplinary isolation from attending school and from regularly receiving tutoring or other individualized instruction or classroom services.  These children are left without any regular educational instruction for as long as they are in disciplinary isolation.  At most a teacher comes to the SHU once a week for less than ten minutes, but more often juveniles in the SHU go for weeks at a time without receiving any school work or instruction.  Juveniles held in isolation in their cells are occasionally allowed out for instruction, but more regularly are given a packet of worksheets to complete in their cell alone. Upon information and belief, the Chenango Valley School District makes no meaningful effort to provide juveniles held in solitary confinement with educational instruction.

61.     When juveniles are informed that they will be subject to disciplinary isolation, the Sheriff's Office and the School District do not evaluate the impact of the discipline on their schooling.  They receive no notice that when charged with a misbehavior that isolation will result in a complete denial of meaningful educational instruction, or that they will be cut off from their regular class work. Students placed in administrative segregation are denied access to education— sometimes for weeks at a time—without any adjudication as to their guilt with respect to the misbehavior charges.

62.     When the disciplinary hearing finally does happen, the hearing officer makes no finding that the misbehavior was related to the Jail's educational program.  Nor does the hearing officer make an affirmative finding that the juvenile's continued presence in school would pose a threat to anyone.  Aside from appealing the underlying disciplinary decision, there is no process for reviewing the denial of educational services.

63.     Because disciplinary isolation is used so cavalierly, Defendants take away educational services for any reason or no reason at all.  Even when an infraction has nothing to do with school, juveniles are removed from all education and related services and programming without any notice or opportunity to be heard.

### *Denying Juveniles with Disabilities in Disciplinary Isolation a Free and Appropriate Public Education Required by the IDEA*

64.     Juveniles with qualifying disabilities under the IDEA are also subject to the Defendants' policy and practice of denying meaningful educational instruction to juveniles in disciplinary isolation. Once in disciplinary isolation, juveniles with disabilities, like their non-disabled peers, are subjected to the Defendants' policy and practice of cutting off meaningful educational instruction to juveniles in disciplinary isolation.

65.     Upon information and belief, the education-by-worksheet approach does not comply with the Individualized Education Program ("IEP") of children with qualifying disabilities under the IDEA.  Students with emotional disabilities and learning disabilities need specialized instruction and accommodations in order to

19

access education.  For example, one major modification for children with ADHD is to break up large assignments into smaller parts.  Handing a child with ADHD a bundle of worksheets does not serve to make education more accessible to him or her.  In addition, worksheet packets do not make education more accessible to those students who have significant difficulties with reading.

66.     Moreover, Defendants discriminate against juveniles with qualifying disabilities by failing to determine whether a juvenile's behavior is a manifestation of their disabilities.  Under the IDEA, a juvenile with disabilities is entitled to procedural protections if they will be excluded from school for 10 consecutive days or more, or if the juvenile is subjected to series of removals totaling more than 10 days in a school year based on a pattern of behavior.  In that event, a meeting of the relevant members of the juvenile's IEP team must be held, after inviting the juvenile's parents, to determine if behavior resulting in the discipline is a manifestation of the juvenile's disability.  If so, the school must return the juvenile to class, and develop appropriate supports to address the behavior.  None of these procedural protections are provided to juveniles with disabilities at the Broome County Jail.

## PLAINTIFFS' INDIVIDUAL ALLEGATIONS

### Plaintiff A.T.

67.     Seventeen-year-old A.T. likes music and basketball. He misses spending time with his family especially his ten year old sister. A.T. lives with his girlfriend, one year old, and his girlfriend's mother in Binghamton, New York.

When A.T. gets out of the Broome County Jail, he wants to marry his girlfriend, and get a job so he can support his young son.

68.    A.T. has been diagnosed with Bi-Polar Disorder and ADHD. A.T. has had an IEP in school since 6th grade, and, before being incarcerated at the Jail, he was in 10th Grade at Binghamton High School.  He struggles to do well in math and reading without extra support from his teachers.

69.    A.T.'s disabilities make it difficult for him to pay attention for extended periods of time, make him feel anxious, depressed, and impulsive. He is an individual with a disability as defined by the ADA and Section 504.

70.    A.T. is a pretrial detainee and has been at the Jail since November 3, 2016 but has also been detained at the jail previously on other charges.  He will be held at the Jail until his criminal case is resolved.

71.    A.T. has been sanctioned with disciplinary isolation at the Jail at least 15 times for a total of over 150 days. A.T. has been placed in disciplinary isolation several times for minor infractions. He was placed in the SHU for 30 days for writing on an extra sweatshirt, 15 days keep-lock for requesting to eat out of his cell and yelling out his cell door when locked in, and two days in keep-lock because a guard said he smelled smoke in his cell, and one day in keep lock for talking back to a corrections officer.  He is currently in the SHU as a result of a fight and will be in the SHU until December 9, 2017.

72.    A.T. has little to do in the Box.  Being locked in for so long has made him feel depressed and alone.  He passes the time by pacing around his cell and

doing push-ups.  He also reads a lot but has not received many new books since getting to the Box in March, so he is stuck re-reading the same books over and over again.  Regularly the boredom becomes so bad that he just lays on his bed until he falls asleep.

73.     Since he got to the Box, A.T. has been worried about adult harassment. He has seen adults throw urine on other inmates and corrections officers.  Adults regularly tell him that they are going to "get him" when they get out for recreation. Adult inmates not only threaten A.T. but also his family. One adult told A.T. when he gets out of jail he will slit A.T.'s infant son's throat. More than once an adult inmate has thrown a cup of urine at the floor in front of his cell door and the urine flowed under the door into his cell.  A.T. has been in multiple fights with adult inmates during his recreation time in the Box.  Often the adults would instigate him into reacting by insulting him, his mother, or his young son.

74.     The first week A.T. got to the Box he was shackled during recreation. He was shackled around his waist, wrists and ankles.  The restraints severely restricted his movement and made exercise extremely difficult.  He has been shackled during recreation in the Box several other times including for a period of over one month.  Being shackled during recreation makes him frustrated and depressed.  He wants to be able to enjoy the one hour he has out of his cell but the shackles make that impossible.

75.     During one incident in the Box, A.T. was given a cheese sandwich and milk for lunch.  A.T. complained that he cannot eat the food because he is lactose

intolerant. The corrections officers ignored him. Everyone in the Box refused to give back their trays until A.T. was given a different meal.  Eventually the corrections officer gave him a peanut butter sandwich but the bread was stale and there was hair on the sandwich.  A.T. became upset and started yelling. The corrections officers responded by entering A.T.'s cell and forcing him into a mechanical restraint chair.  While in the chair he was pepper sprayed. After being sprayed he was taken to the medical unit still in the chair and water was poured over his face by a nurse.  He was then placed in a cell in the medical unit, still in the clothes covered in pepper spray and in the restraint chair.  After several hours in the restraint chair he was taken out of it and told to strip his clothes off.  The corrections officers did not give him new clothes after he stripped. He stayed in medical unit cell naked for the next two and a half days.

76.    A.T. exhibits symptoms that directly correlate with his placement in solitary confinement.  A.T. feels stressed, anxious, angry, and hopeless, consistent with a moderate to severe depression.  He rarely gets visitors.  He has previously had suicidal ideations from being in the Box. Nobody from mental health has ever come to check on him when he was in disciplinary isolation. The only time anyone from medical comes to the Box is to pass out medications. Prior to placing him in isolation nobody from the Jail spoke with A.T. about his disabilities.

77.    Each time A.T. has been in disciplinary isolation, either in keep-lock or in the SHU, he could not attend education classes or programming.  He had no notice or a hearing about cutting him off from education classes as a sanction for

rules violations he was charged with.  Previously in disciplinary isolation A.T. would sporadically receive packets of worksheets as his education.  No teacher ever helped him with the worksheets, and he could not complete them on his own.  For the past several months the School District stopped delivering packets to A.T. when he was in solitary confinement.

78.    A.T. has tried to file grievances several times since being incarcerated at the Jail. He has asked the Broome County Jail grievance coordinator, who refused to give him a grievance slip on two occasions.  He has filled out multiple request forms to see the grievance coordinator all of which went unanswered.

**Plaintiff B.C.**

79.    Seventeen-year-old B.C. loves his mom, who always looks out for him. When he gets out of jail he hopes to graduate high school, get a job and start a family.

80.    B.C. has been diagnosed as Learning Disabled since he was very young, and also deals with severe anxiety issues.  He takes medication to deal with his mental health issues.  The jail is aware of B.C.'s mental health needs.  At the jail mental health staff provide him with an anti-anxiety medication and medication to help him sleep at night. Before being detained B.C. was taking 9th and 10th grade classes at an alternative BOCES program in Broome County. In school he had an IEP to help him reach his goals.

81.    B.C.'s learning disabilities and anxiety disorder affect his ability to complete school work, pay attention, follow directions, and his decision making.  He is an individual with a disability as defined by the ADA and Section 504.

82.    B.C. is a pre-trial detainee and has been held at the Jail for more than a year.  Almost half the time he has spent in the Broome County Jail has been in solitary confinement.  When B.C. first arrived at the Jail he was placed in "protective custody" for two months. "Protective custody" is served in the SHU and B.C. had the same restrictions as inmates serving a sanction in disciplinary isolation while in protective custody.

83.    B.C. has been sanctioned with disciplinary isolation more than 10 times for a total of over 125 days.  He is currently in the Box for a fight with another detainee.  He will remain in the Box until September 23, 2017. Many of his keep-locks have come from acting like a normal teenage boy: he received days in keep-lock for talking loudly, singing, horseplay on the pod, arguing with other juveniles, saying hello to his brother who he saw in the hallway of the jail, and not having a clean enough cell and for playing with snow on the recreation yard.

84.    B.C. has little to do in the Box.  To pass the time he works out, reads the Bible and watches flies and spiders outside his window.  He has started to talk to himself since being in the Box. Because of the intense feelings of boredom, he experiences in isolation most of his day is spent sleeping. Despite these feelings of boredom B.C. will occasionally refuse recreation because of threats he received from

adult inmates. He once went three days without leaving his cell because he did not want to have to deal with the adult inmates' harassment.

85.     The abuse B.C. suffers is not only at the hands of the adult inmates. Corrections officers regularly provoke him and trigger him to react by discussing his charges or insulting him.  On one occasion, corrections officers were conducting searches of the cells in the Box.  They approached B.C.'s door and told him to kneel on his bed.  B.C. complied and was handcuffed. The corrections officers began to throw his personal belongings outside of the cell.  B.C. argued with them but they continued to throw his items out of the cell.  After more protests from B.C., one of the corrections officers took B.C.'s clothes, blankets, and sheets, stuffed them in B.C.'s toilet, poured soap on the clothes and flushed it.  The officer told B.C. he was "just doing laundry."  One corrections officer then took B.C.'s handcuffs off and threw him against his toilet and onto the ground. While on the ground B.C. was repeatedly struck in the head and body by the corrections officer who threw him down.  B.C. ended up with a swollen face and black eye.

86.     Corrections officers have repeatedly knocked on B.C.'s cell door during the night to keep him from falling asleep.

87.     B.C. has been put in mechanical restraints many times during recreation since being sent to the Box.  He is shackled around the waist, ankles, and wrists. Like every new arrival to the Box he was shackled during recreation for his first week there. The longest time he has been forced to wear shackles during

recreation was three weeks.  Being shackled during recreation makes him feel like he is an animal.

88.     B.C. exhibits symptoms that directly correlate with his placement in solitary confinement.  B.C. is irritable and become agitated easily.  He has lost interest in other people or things and feels more discouraged about his future than he used to be. B.C. is depressed in the Box.  He has nothing to do in his cell.  He can't sleep at night because so many adults yell and scream all night.  B.C. has not been able to get any meaningful therapy or counseling services.  No mental health workers come to his cell.  Prior to placing him in isolation nobody from the Jail spoke with B.C. about his disabilities.

89.     In solitary confinement B.C. has been denied access to educational instruction and programming.  On the rare occasions he receives school work, he has trouble completing it because there is no teacher he can ask questions to and he does not receive the special education supports he needs.  B.C. once went for almost three months without seeing an instructor or receiving work packets.  He has never received a notice or a hearing about cutting him off from education classes as a sanction for rules violations.

90.     Several times B.C. has tried to file a grievance about the conditions of solitary confinement and not receiving any educational instruction.  On the juvenile pod corrections officers routinely ignored him.  Since being in the Box, B.C. has asked for several grievance forms to complain about the conditions of his confinement.  B.C. was able to file one grievance but never received a response. He

followed that grievance attempt with additional requests to see the grievance coordinator but those requests were also ignored.

91.     The Defendants' actions or inactions have been taken under color of state law.

## CLASS ALLEGATIONS

92.     All Plaintiffs bring the First and Second Causes of Action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking declaratory and injunctive relief on behalf of a class of all present and future 16- and 17-year-olds who are now or will be incarcerated at the Jail.  All class members face a substantial risk of serious harm as a result of the Sheriff's Defendants' disciplinary isolation policies and practices, and all class members face an unlawful denial of educational services without due process.

93.     All Plaintiffs bring the Third Cause of Action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking declaratory and injunctive relief on behalf of a subclass of all current and future 16 and 17-year-olds with disabilities, as defined by the Individuals with Disabilities Education Act, who are or will be incarcerated at the Broome County Jail and are in need of special education and related services ("IDEA Subclass").

94.     All Plaintiffs bring the Fourth and Fifth Causes of Action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking declaratory and injunctive relief on behalf of a subclass of all current and future 16- and 17-year-olds with psychiatric and/or intellectual disabilities, as defined by the

Americans with Disabilities Act and Section 504 of the Rehabilitation Act, who are at risk of being placed in disciplinary segregation at the Broome County Jail because of their disabilities ("ADA and 504 Subclass").

95.    All four requirements of rule 23(a) are satisfied:

a.    *Numerosity*: Joinder of all class members is impracticable because of the size of the class and the characteristics of the class members.  At any given time, all of the juveniles incarcerated at the Broome County Jail are at a significant risk of unconstitutional placement in isolation, unlawful denial of educational services, and unlawful discrimination because of disability-related misbehavior.  Between May 2016 and May 2017, more than 80 juveniles were held at the Broome County Jail.  Every month, additional class members cycle in and out of the Broome County Jail.  Many of these juveniles are unable to file lawsuits on their own because of their youth, special education needs, disabilities, lack of financial resources, and length of time they will be incarcerated.

b.    *Commonality*: There are questions of law and fact common to all members of the class, including, but not limited to whether the Defendants' policies and practices of placing 16 and 17 year olds in disciplinary isolation have resulted in and will continue to result in in a violation of the class members' Eighth and Fourteenth Amendment rights, whether Defendants practice of locking juveniles with psychiatric and/or intellectual disabilities in disciplinary isolation based on their disabilities violates the ADA and Section 504 of the Rehabilitation Act, whether the Defendants have unlawfully denied educational services in violation of

the class members' Fourteenth Amendment rights and whether the Defendants have violated the IDEA subclass members' rights under the IDEA.

   c. *Typicality*: The claims of the named Plaintiffs are typical of those of the class.  All named Plaintiffs are incarcerated at the Broome County Jail. Each named Plaintiff has been subjected to the challenged policies and practices.

   d. *Adequacy of Representation*: The named Plaintiffs, their representatives, and class counsel will fairly and adequately represent the interests of the class.  The named Plaintiffs and their representatives have no interests in this matter that are antagonistic to other class members. Class counsel have many years of experience in civil rights and class action litigation.

  96. Class-wide declaratory and injunctive relief are appropriate under rule 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

## JURISDICTION AND VENUE

  97. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 the Americans with Disabilities Act (ADA) 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400-1482.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

  98. This Court has jurisdiction to issue the declaratory relief requested pursuant to the Declaratory Relief Act, 28 U.S.C. §§ 2201 and 2202.  This Court may also grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil

Procedure.  This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

99.     Venue is proper in the Northern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2).  Defendants have their official residence in the Northern District of New York. A substantial part of the events and omissions giving rise to the claims in this action occurred in this district.

## CLAIMS FOR RELIEF

### First Cause of Action

100.    The Sheriff's Defendants' actions or inactions have violated and continue to violate the named Plaintiffs and putative class members' rights under the Eighth Amendment and Fourteenth Amendment of the United States Constitution.

### Second Cause of Action

101.    The Defendants' actions or inactions have violated and continue to violate the named Plaintiffs' and putative class members' rights under the Fourteenth Amendment.

### Third Cause of Action

102.    The Defendants' actions or inactions have violated and continue to violate the named Plaintiffs' and the rights of the putative IDEA Subclass members under the Individuals with Disabilities Education Act, 20 USC §§ 1400 et seq.

### Fourth Cause of Action

103.    The Sheriff's Defendants' actions or inactions have violated and continue to violate all Plaintiffs and the putative ADA and Section 504 subclass members' rights under Title II of the Americans with Disabilities Act.  All Plaintiffs and members of the putative ADA and Section 504 subclass seek declaratory and injunctive relief remedying these ongoing and systemic violations.

### Fifth Cause of Action

104.    Sheriff's Defendants' actions or inactions have violated and continue to violate all Plaintiffs and the putative ADA and Section 504 subclass members' rights under Section 504 of the Rehabilitation Act of 1973.  All Plaintiffs and members of the putative ADA and Section 504 subclass seek declaratory and injunctive relief remedying these ongoing and systemic violations.

### REQUESTS FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

a.  Declare that Sheriff Defendants' acts and omissions violated the named Plaintiffs' and class members' rights under the Eighth and Fourteenth Amendments;

b.  Declare that Defendants' acts and omissions violated named Plaintiffs' and IDEA Subclass members' rights under the IDEA, 20 U.S.C. §§ 1400-1482;

c.  Declare that Sheriff Defendants' acts and omissions violated the named plaintiffs' and the ADA and Section 504 subclass members' rights under Title II of the ADA, 42 U.S.C. §§ 12101-12213;

d.  Declare that Sheriff Defendants' acts and omissions violated the named

plaintiffs' and the ADA and Section 504 subclass members' rights under

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794;

e.  Enter all necessary and appropriate injunctive relief (including, but not

limited to, policies, procedures, training, supervision, and monitoring) to end

the ongoing violations of the U.S. Constitution and federal law;

f.  Award the Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. §

1988, 42 U.S.C. § 12205, and 42 U.S.C. § 1415; and

g.  Grant any other relief that the Court deems necessary and proper.

Dated: August 8, 2017
        Syracuse, New York

Respectfully submitted,

/s/ Joshua Cotter
Joshua Cotter (Bar No. 518217)
Sarah Morrisson*
Susan Young (Bar No.102862)
Samuel Young (Bar No. 508916)
LEGAL SERVICES OF
CENTRAL NEW YORK
221 S. Warren Street, 3rd Floor
Syracuse, NY 13202
Tel:  (315) 703-6500
jcotter@lscny.org

*Attorneys for Plaintiffs*


*Pending submission of
Application for Admission*

33