UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

A.T., a minor, by and through his parent and
natural guardian Sha-keema Tillman; B.C., a
minor, by and through Kristi Cochardo; on behalf
of themselves and all others similarly situated,

                              Plaintiffs,

v.

DAVID HARDER, Broome County Sheriff, in his
official capacity; MARK SMOLINSKY, Jail
Administrator of the Broome County Correctional
Facility, in his official capacity; KEVIN MOORE,
Deputy Administrator, in his official capacity;
CHENANGO VALLEY CENTRAL SCHOOL
DISTRICT,

                              Defendants.

Civil Action No.: 9:17-CV-00817

---

## MEMORANDUM OF LAW

ROBERT G. BEHNKE
Broome County Attorney
Broome County Attorney's Office
Edwin L. Crawford County Office Bldg.
PO Box 1766
Binghamton, NY 13902-1766
(607)778-2117

BROOME COUNTY ATTORNEYS OFFICE • BROOME COUNTY OFFICE BUILDING
GOVERNMENT PLAZA • BINGHAMTON, N.Y. 13901

# TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................................ 1

POINT I
THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED
............................................................................................................................................................ 9

POINT II
THE OFFICIAL CAPACITY CLAIM AGAINST KEVIN MOORE SHOULD BE
DISMISSED.....................................................................................................................................17

CONCLUSION................................................................................................................................. 18

BROOME COUNTY ATTORNEYS OFFICE • BROOME COUNTY OFFICE BUILDING
GOVERNMENT PLAZA • BINGHAMTON, N.Y. 13901

## STATEMENT OF FACTS

A.T. and B.C. commenced this action challenging the Defendant's use of keep lock and administrative segregation for juvenile offenders at the Broome County Correctional Facility. They have presently brought a motion seeking a preliminary injunction regarding the use of keeplock and administrative segregation at the Correctional Facility.

Plaintiffs A.T. and B.C. are no longer housed at the Broome County Correctional Facility. They were transferred to state prison after their convictions on their pending criminal charges. The Plaintiffs' papers contain declarations from three other juvenile inmates. Of these three juvenile inmates, inmates O.C. and C.J. are no longer housed at the Broome County Correctional Facility. These three juvenile inmates are not named Plaintiffs in this action.

Inmate C.J. received seven 24 hour keep locks and one seven day keep lock. He received 24 hour keep locks for failing to keep his cell sanitary on September 8, 2017. On October 10, 2017, C.J. received a twenty-four hour keep lock for making a threat to a person, conduct that disrupts the safety and operation of the facility and non-compliance with a housing unit or regulation. On July 22, 2017, and August 17, 2017, he received 24 hour keep locks for horseplay. On August 19, 2017, he received a 24 hour keep lock for disrespecting an officer. On August 28, 2017, C.J. received a 24 hour keep lock for refusing an Order and kicking his cell door. On August 29, 2017, C.J. received a seven day keep lock for refusing an Order and conduct which disrupts the safety or operation of the facility. In his declaration, C.J. claims he was using the toilet when the count occurred. As the incident report documents the standing counts are performed three times a day. They are performed at the same time each day in the housing unit. When the Pod officer was performing the count he observed C.J. sitting on his toilet. However, C.J. had his pants up and was not going to the bathroom. The officer ordered

C.J. to stand for the count three times. Each time C.J. refused. C.J. had been housed in the correctional facility for approximately two months at the time of this incident and was familiar with the count procedures and times. Inmate C.J. admitted to all the violations including the August 29, 2017 incident and waived his rights to a hearing.

The juvenile inmates are not out of their cells at the same time as the adult inmates. The only adult inmates in F Pod are in classification which means they are in their cells for 23 hours a day. In D Pod the juveniles and adults are not out of their cells at the same time.

C.J. also alleges that food trays are prepared by adult inmates that show favoritism to inmates they know by supplying extra food on meal trays. This allegation is untrue. Adult inmates prepare the food trays but have no control over what tray goes to what inmate. The trays are not labeled with an inmate's name. All juvenile inmates receive age specific diets with a minimum caloric intake of 2800 calories per day. Juvenile inmates are provided three meals a day and a snack in the evening. Meal trays are distributed by Corrections Officers in D-pod and F-pod.

Inmate A.T. received repeated violations starting with a 24 hour keep lock on November 12, 2016. On this occurrence, he refused an order to eat his meal in his cell. A.T. advised the officer that he would not be eating his meal in his cell and was standing so that the officer could not close the cell door. In addition, both before and after this incident A.T. had been asked numerous times to step away from his cell door due to yelling and disrespectful commentary.

On November 14, 2016, A.T. was again subject to discipline. During a shakedown on this date A.T. was found with an extra sweat shirt in his cell. He had written "trouble bangaa" on it. A.T. admitted to this violation and waived his hearing. On November 21, 2016 A.T. and other inmates attacked inmate R. A.T. admitted this charge and waived his hearing.

BROOME COUNTY ATTORNEYS OFFICE • BROOME COUNTY OFFICE BUILDING
GOVERNMENT PLAZA • BINGHAMTON, N.Y. 13901

On January 26, 2017, A.T. received a 24 hours keep lock for refusing an order and refusing to participate in GED. On January 31, 2017, A.T. was placed in SHU pending an investigation based on a complaint that he was threatening other inmates; and ordering them to go in F Pod program room to fight. On February 23, 2017, A.T. admitted guilt to these violations. On March 3, 2017, A.T. admitted to possession of contraband.

On March 19, 2017, A.T. was yelling in his cell, threatening inmate P.S. He also told the officer he would not comply with housing rules the next day. While in D Pod on April 11, 2017, A.T. punched inmate D.T. in the face. Also on April 11, 2017, in D Pod, A.T. shouted at the nurse preparing medications that "I will cut you bitch." On April 13, 2017, in D Pod, A.T. threw a stack of paper towels down the tier and refused to lock in. A.T. then proceeded to advise officers that once he was off double team full restraint he would attack someone else. He also ordered an officer to move so he could hit Officer Lucas. He threatened the other male officers and told Officer Conners that he doesn't give a fuck about anything and the officers needed to get that through their heads. He told Officer Conners he would attack someone to make sure he was classified to the box.

On April 18, 2017, while in the holding area at the Courthouse, A.T. called inmate E. a bitch and that he would "pop off" on E. "once the cuffs are taken off." On May 12, 2017, in D Pod A.T. refused orders to return from recreation. A.T. initially refused to return then began walking slowly towards his cell. When A.T. was told to lock in he became verbally aggressive towards Lt. Brown. A.T. called Lt. Brown names and told Brown to "come to his cell alone" and A.T. "would beat the shit out of Lt. Brown." A.T. admitted to this and waived his hearing. Due to these threats A.T. was made a double team full restraints. On May 17, 2017, A.T. refused to

3

stand for the standing formal count in D Pod. He was ordered four times to stand for the count and A.T. refused each time.

On June 11, 2017, A.T. and B.C. engaged in a fight with each other in D Pod. A.T. admitted to fighting B.C. and all other charges resulting from this incident. On July 7, 2017, in D Pod, A.T. refused repeated orders over the course of 30 minutes to stop yelling out of his cell and banging on his door. On July 14, 2017, A.T. threw his dinner tray out his food port and all over the lower tier outside his cell. A.T. then told Officer Hrebin to "suck his dick" and "why don't you come to my cell so I can slap you."

A.T. alleges that he has a disability. However, his medical intake form does not identify a disability. A.T. was transferred to state prison on August 23, 2017.

B.C. received a 24 hour keep lock on August 27, 2016 and September 2, 2016 for refusing an order. On October 21, 2016 B.C. received a 24 hour keep lock for non-compliance with a housing rule. On October 28, 2016, B.C. received a 24 hour keep lock for throwing toilet paper out of his cell door. On January 7, 2017, B.C. received a 24 keep lock for disobeying a direct order. On January 16, 2017, B.C. received a keep lock for horseplay. On January 25, 2017 B.C. received a keep lock for having extra cleaning supplies and clothing in his cell. B.C. admitted to each of these violations and waived his disciplinary hearing.

On February 21, 2017, B.C. was charged with an assault for a fight in the F Pod program room. B.C. admitted to this violation and waived his hearing. On March 18, 2017, B.C. called Officer Rowe a "bitch" and said the officer would not come into his cell. B.C. went to his cell and stood with the door open. Officer Rowe did a tour and B.C. threw his cell door into Officer Rowe when the officer came by B.C.'s cell. B.C. slammed the cell door into Officer Rowe and challenged Officer Rowe to come into the cell. Officer Rowe pushed B.C. into his cell and tried

to close the door. B.C. rushed the door and pushed it open again before the door could close. Officer Rowe pushed B.C. into his cell again and was able to close the cell door.

On April 24, 2017, inmates were coming in from recreation. B.C. ran up to inmate H. and punched H. in the face. A fight occurred. B.C. admitted to this violation. On May 7, 2017, B.C. ripped towels to make a homemade fishing line. B.C. was charged with contraband, damaging county property and disruption of facility. He admitted the charges.

On June 11, 2017, B.C. fought with Plaintiff A.T. in D Pod. B.C. admitted to the charges. This was B.C.'s fifth hearing for a violent offense.

The Plaintiffs have produced a declaration of inmate D.K. Over the course of three separate incarcerations D.K. served three separate 24 hour keep locks. The first occurred on January 26, 2017 for refusing an order and refusing to attend GED. The second occurred on March 3, 2017 for contraband. On March 6, 2017, D.K. was observed throwing urine into another inmate's cell while in F Pod. Inmate D.K. admitted to this violation. He was given thirty-five days of keep lock not forty-five as he alleges.

D.K. was not placed under investigation for using string to obtain a bag of chips. According to the Sheriff's records the only multiple day investigation regarding D.K. was regarding his birthdate. In April 2017, D.K. was going to be moved to an adult pod. He notified the officer that his listed birthdate was incorrect. D.K. stated that his actual birthdate was eight months later. The incorrect birthdate came from the court information received by the Correctional Facility. Due to the question of the birth date D.K. was placed under investigation until his age could be verified so the facility could house him in the proper unit. D.K. alleges in his declaration that he was placed in hand and leg shackles. There is no paperwork in D.K.'s file that indicates he was placed in full restraint at any time. D.K. also alleges that he witnessed

adult inmates throwing urine at each other. As was pointed out earlier, D.K. admitted to throwing urine in another inmate's cell in March, 2017. On October 10, 2017 D.K. received a 24 hour keep lock for making a threat to another person. D.K. admitted to this violation.

The Plaintiffs also produced a declaration from inmate O.C. O.C. alleges he was disciplined five different times over six previous incarcerations over the last two-years. The Sheriff's records document that O.C. received two disciplines. He received a 24 hour keep lock on November 1, 2016 for refusing an order and non-compliance with a housing rule or regulation, and horseplay. The second occurred on July 22, 2017 for horseplay. There is no record of O.C. receiving a multiple day keep lock in F Pod despite O.C.'s claim to the contrary. O.C. received a remainder of shift keep lock on August 29, 2017 for spraying another inmate with a cleaning solution. There is no record of a 24 hour keep lock for spraying a friend. with water.

O.C. refers to physical abuse by the SERT on November 22, 2016. As the Sheriff's reports document the SERT entered the housing unit for a shakedown. All inmates are given specific, precise orders to be out of their cells, be quiet, stay on the ground and not move during the shakedown. According to the reports O.C. had to be given two additional orders to keep his head down and stop moving. O.C. became argumentative with the SERT members. Due to O.C. being disruptive during the shakedown, he was handcuffed and taken to his cell to be searched and removed from the other inmates. During the escort, O.C. remained disruptive, combative, and non-compliant. Before the SERT unit left the housing unit, they saw O.C.'s glasses had been left in the day area and went to return them to him. O.C. began yelling at the Officer and swinging his arms around in a threatening manner. He refused to comply with the Officer's directions to cease his outburst. O.C. was restrained again in his cell and became compliant.

BROOME COUNTY ATTORNEYS OFFICE • BROOME COUNTY OFFICE BUILDING
GOVERNMENT PLAZA • BINGHAMTON, N.Y. 13901

After the SERT team had left F Pod, O.C. again became non-compliant. He was kicking his door and yelling to the housing officer that he wanted SERT to come back to his cell so he could fight them all. The housing officer asked O.C. to quiet down and stop being a disruption. O.C. then threatened the housing officer by telling Officer Vasquez to "come and make me." At 0200 hours on November 23, 2016, SERT was called and O.C. was removed from the pod by the SERT and taken to SHU.

The Plaintiffs allege that while in D-pod they only are provided one book which they must read again and again. Once again the inmates' statements are untrue. As the Defendants point out for their first day in D-pod (special housing) they are permitted their legal papers and a bible. After the first day, they can have three books and three magazines in their cell. They also have the ability to read three newspapers. They can read the Binghamton Press & Sun Bulletin, the New York Post and the USA Today. When the inmates finish reading their books they are able to ask for additional books and swap books between cells. The inmates in D-pod also have access to paper, writing supplies and envelopes.

The inmates housed in D-pod have the ability to jog, walk and do exercises in the recreation yard. Inmates in restraints during recreation in D-pod are able to walk around the yard.

There is no record of any inmates being assaulted by Corrections Officers. There is no evidence of any inmates watching the juvenile inmates shower. There is no evidence of any adult inmates threatening juveniles. In fact, the officers indicate that they would observe the juveniles harassing the adults. Had an adult threatened a juvenile, the adult would have been disciplined. There is no evidence of adults throwing urine, however D.K. did admit to throwing urine into another inmate's cell.

7

James Borchardt, who handles inmate grievances states that no juveniles have filed a grievance regarding any of the issues raised in this legislation.

In 2017, the Broome County Correctional Facility was accredited by the National Commission of Correctional Health Services which indicates that the facility operates in compliance with NCCHC standards. The Chenango Valley School district and Plaintiffs have reached a settlement regarding the educational issues alleged in this litigation. The County Defendants intend to work with the School District to implement that settlement. The New York State Commission of Corrections has proposed new regulations regarding Inmate Confinement and the Deprivation of Essential Services. These new regulations will be applicable to County Correctional Facilities in New York. The purpose of these new regulations is to address the constitutional issues regarding juveniles in addition to inmates in general. The new regulations are intended to meet the constitutional requirements of the Eighth and Fourteenth Amendments. The Defendants oppose the motion for a preliminary injunction.

# POINT I

## THE PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

The Plaintiffs in this motion seek a preliminary injunction during the pendency of this action. As set forth in their Memorandum of Law the Plaintiffs seek an injunction preventing the use of administrative segregation of any juvenile no matter how serious the offense, provide all eligible juveniles educational instruction and order that every juvenile with an intellectual or mental disability an individualized assessment prior to disciplining them.

For a preliminary injunction the Plaintiffs must establish a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor, a likelihood of irreparable harm, that the balance of hardships tip in their favor regardless of the likelihood of success and that the injunction is in the public interest. As this Court stated in cases like this one where the movant commands an affirmative act or mandates a specific course of conduct a heightened standard applies. This type of preliminary injunction should issue only upon a clear showing that the moving party is entitled to the relief requested or where extreme or very serious damage will result from a denial of a preliminary injunction.

As this Court has stated in the prior context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of prisons.

The Plaintiffs rely on three Supreme Court cases for the premise that children enjoy heightened protections and that children are constitutionally different than adults. At least one District Court criticizes the reliance on these cases stating that such a broad statement as made by

9

Plaintiffs is not applicable in situations other than sentencing. Hughes v Judd 108 F Supp 3d 1167 (MD FL 2015). As that Court pointed out Justice Kagan in writing for the majority in Miller is more precise with her words. Justice Kagan states that children are constitutionally different than adults for "purposes of sentencing". Similar to the Plaintiffs in Hughes, the Plaintiffs in this case read more into the statement than intended by Justice Kagan.

Courts in this district have determined that administrative classifications of pretrial detainees, even where classifications come with restrictive conditions, do not give rise to a liberty interest absent evidence of an intent to punish. Parson v York 2017 WL 1076536 (NDNY 2017). In the case of Plaintiffs A.T. and B.C. their placement and length of the time they were in the Special Housing Unit is directly related to the threat they posed to other inmates and staff. On December 13, 2016, A.T. admitted to assaulting inmate R. On January 31, 2017, A.T. was threatening other inmates and ordering them to go into the F-pod program room and fight. This was confirmed by other inmates. On March 19, 2017, A.T. was threatening inmate P.S. while in D-pod. On April 11, 2017, A.T. assaulted inmate D.T. On April 11, 2017, A.T. also threatened the nurse passing meds saying "I will cut you bitch". On April 13, 2017, A.T. threatened Officers Kirk and Conners. A.T. also stated that when he was taken off double team full restraint he would attack someone else. A.T. also told Officer Conners to move so he could hit Officer Lucas. On April 18, 2017, A.T. was in a holding area at the Courthouse when he called inmate E a "bitch" and said he would "pop off" on E "once the cuffs were taken off". On May 12, 2017, in D-pod A.T. threatened Lieutenant Brown. A.T. told Brown to come to his cell alone and A.T. would "beat the shit out of him". On June 11, 2107, A.T. and B.C. "squared off" and A.T. and B.C. fought each other. On July 14, 2017, A.T. told Officer Hrebin to come into his cell so A.T.

could slap him. Each of these incident reports can be found at Exhibit C of the County's response to the class certification motion.

It should be clear from these reports that A.T. was a threat to the safety of the officers and other inmates based on his repeated assaultive and threatening behavior. Given his actions, his placement in the special housing unit was justified to protect the safety of the facility. Protecting the safety of the Officers and other inmates is a legitimate governmental objective. Unlike in Parsons where there was no explanation of why the inmate was in administrative segregation for nine months, in this case A.T. remained in the special housing unit because of his repeated threats and actual assaults of other inmates.

On February 21, 2017, B.C. was placed in the special housing unit because of a fight that occurred in the F-pod program room. He was released from special housing on March 14, 2017. On March 18, 2017, B.C. called Officer Rowe a "bitch" and while Officer Rowe was doing a tour, B.C. threw his door open to hit Officer Rowe. On April 24, 2017, B.C. ran up to inmate H and punched him in the face resulting in a fight between B.C. and H. Both inmates were taken to special housing. On June 11, 2017, B.C. and A.T. fought each other in the special housing unit. These incident reports are found in Exhibit E to the County's response to Plaintiff's class certification motion.

Inmate D.K. was moved to special housing after he threw urine in another inmate's cell on March 6, 2017. D.K. was also placed in keeplock while his date of birth was confirmed. The incident reports regarding D.K. are contained in Exhibit F of the response to the class certification motion. Many, if not all, of the studies relied upon by the Plaintiffs acknowledge that isolation may be necessary for the protection of the facility, the staff or other inmates. In each of the cases identified the lengthy isolations are a result of actions by the inmate that put

11

Officers or other inmates at risk of injury, and were justified. These are decisions that the Courts have held are within the purview of the jail administrators. In fact, for the named Plaintiffs A.T. and B.C. their length of stay in special housing was due to their repeated assaults and threats of assaults. It was not due to any attempt to punish A.T. and B.C.

The Plaintiffs rely on a series of cases involving the juvenile systems. The Hughes court distinguished Morgan v Sprout because it arose under the "arcane Mississippi Youth Court Act". The Hughes court distinguished Morgan because Morgan dealt with youth not charged with a crime. The Court found a distinction between a civil committed juvenile and a pre-trial juvenile detainee. Hughes, supra at 1204.

The Plaintiffs rely on a declaration of Dr. Andrea Weissman. In that declaration, Dr. Weissman makes the conclusory statement that the Broome County Correctional Facility is one of the "worst" she has ever seen. Such a conclusory statement should be give no weight by the Court. In addition, the New York State Commission of Corrections issued a report on February 14, 2018 which identifies the five worst jails in New York State. Broome County is not identified. Dr. Weissman accepts as true any claims made by the Plaintiffs. However, the record documents that what the Plaintiffs claim is not true. For example, each inmate claims they only have one book in special housing and must read it repeatedly. That is not true. The affidavits of various corrections officers state that each inmate is allowed three books and three magazines in their cell in special housing. They are allowed to exchange books with each other or request additional books. They are also provided three newspapers a day to read. The inmates claim their meals are tampered with. Again, this claim is false. Meal trays are delivered to each housing unit. In special housing the Corrections Officers distribute the meal trays not the inmates. In F-pod the meal trays are also distributed by the Corrections Officers. Despite the

12

claim of the inmates they are not heavily shackled for the first week in the special housing unit. Inmates are in restraints only if they are a threat to other inmates or correctional staff. Dr. Weissman appears to claim or believe that the inmates in the special housing unit do not have access to writing supplies. The Defendants responding papers point out the falsity of that claim. Each inmate in Special Housing has paper, writing supplies and envelopes. They can be purchased through the inmates' commissary account or if the inmate is indigent, they are provided without cost. Inmates in special housing continue to received medical care including mental health services. Dr. Weissman criticizes the outdoor recreation in the special housing unit. Each inmate in special housing has the ability to exercise, jog or walk around the recreation yard. They can choose merely sit and do nothing if they want. They get one hour of outdoor recreation per day. The Second Circuit has approved one hour of outdoor recreation per day as constitutional. Shakur v Sisminski 2009 WL 2151174 (D Conn 2009). In fact, Shakur cites cases that held there is no constitutional right to outdoor recreation (Walker v Jackson 2009 WL 1768547). Shakur also cites to authority in this Court holding there is no constitutional violation where an inmate is required to participate in outdoor recreation in full restraints because inmates could walk about while restrained and could exercise in his cell (Morgan v Rowland 2006 WL 695813). Dr. Weissman talks about alleged abuse at the jail as a fact when her conclusion is based solely on reading the complaint and talking to the Plaintiffs. As set forth in the affidavits of various corrections officers no corrections officers assaulted the inmates. The Plaintiffs point to NCCHC standards regarding juvenile incarceration. We would point out that the NCCHC recently reviewed the facility and reaccredited the facility for another five-year period. This is evidence that NCCHC found the operations complied with their standards.

The Plaintiffs also bring a claim under the ADA and the Rehabilitation Act. Courts have held that a qualifying disability under either statute does not mean that any discipline upon the inmate must be a measured imposition of discipline based on the disability. This is because the discipline of SHU housing does not equate with denying benefits to the inmate. <u>Scherer v Pennsylvania Department of Corrections</u> 2007 WL 4111412 (WD PA 2007), citing <u>Atkins v County of Orange</u> 251 F Supp 2d 1225 (SDNY 2003). The <u>Scherer</u> Court went on to say that certain facilities or specific housing units are not distinct services or programs under the ADA. Citing to the Seventh Circuit the <u>Scherer</u> Court said incarceration which requires the provision of a place to sleep is not a program or activity. Sleeping in one's cell is not a program or activity (citing <u>Bryant v Madigan</u> 84 F 3d 246 (7th Cir 1996). Since these inmates were placed in SHU due to their threat to the facility, officers and other inmates, there is no likelihood of success of the ADA or Rehabilitation Act claim. The <u>Wright</u> case cited by Plaintiffs is not on point. <u>Wright</u> dealt with a request for an accommodation to use a motorized wheelchair.

An additional reason why the Plaintiffs are not likely to succeed on the merits is that there have been no grievances filed by any juvenile inmate. Under the PLRA no action can be brought with respect to jail conditions under Section 1983 unless the prisoner has exhausted his administrative remedies. As set forth in the responding papers the grievance officer states that he has not received a grievance from a juvenile inmate regarding the issues in this litigation. He also states that he never refused to provide grievance forms.

The Plaintiffs have not suffered irreparable harm. As the Court is aware the Plaintiffs have settled their actions against the Chenango Valley School District regarding the educational programs to be provided to the juveniles in the Broome County Jail. The Sheriff's Office will be implementing this agreement with the School District. Since the educational portion of this

litigation has settled to Plaintiffs' satisfaction, they are not suffering an irreparable harm. In the alternative, the Plaintiffs' claim form injunctive relief regarding educational services is moot. The voluntary cessation of allegedly illegal conduct usually will render a case moot if the Defendants can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation. American Freedom Defense Initiative v Metropolitan Transportation Authority 109 F Supp 3d 626 (SDNY 2015). Since the Plaintiffs have settled the education component of this case with the School District and that settlement is being implemented there is no expectation that the alleged violation will recur and the effects of the alleged violation has been eradicated.

The Defendants submit that the same argument applies to the request for injunctive relief regarding the use of administrative segregation. As the record demonstrates since the commencement of this litigation and prior litigation involving Onondaga County, the New York State Commission of Corrections has proposed new regulations which provide that each segregated inmate under the age of eighteen years shall be allowed a minimum of four hours per day, exclusive of entitled exercise periods, outside the sleeping area or individual occupancy housing unit. Under the new regulations each inmate under the age of eighteen will be entitled to an exercise period of two hours per day seven days per week. The new regulations require that disciplinary or administrative segregation for those under age eighteen will be reviewed every seven days. The new regulations require that denials of essential services and inmate cell confinement must be reported to the State Commission of Corrections.

The new regulations allow for the suspension of confinement in order to assess behavioral adjustment of the inmate, confinement can be reinstituted during the suspension if

15

necessary. These new regulations shall be final in a matter of days and the County will be mandated to comply with these new regulations. The new regulations will require that inmates under eighteen in disciplinary or administrative segregation be outside their cell for six hours including two hours of recreation. With the new regulations, the request for preliminary injunctive relief becomes moot. Since the new regulations are mandatory on the County there will be no expectation that the challenged behavior will recur. For the same reasons as previously stated, the adoption of the new regulations also establishes that the Plaintiffs will not suffer an irreparable harm.

When balancing the hardships, the Correctional Facility must maintain safety and security at the facility. When inmates such as A.T and B. C are assaulting other inmates, they must be segregated to protect the other inmates in the facility. When they threaten to assault staff, they must be segregated. When they are throwing urine in the cells of other inmates they must be segregated. In addition, with the implementation of the School District settlement the juveniles will continue to obtain their educational services. With the adoption of the new state regulations the juveniles will have two hours of recreation each day and at least four additional hours out of their cells. This segregation will be monitored by the State Commission of Corrections. We submit that given these changes the balancing of hardships does not favor granting the injunction.

BROOME COUNTY ATTORNEYS OFFICE • BROOME COUNTY OFFICE BUILDING
GOVERNMENT PLAZA • BINGHAMTON, N.Y. 13901

## POINT II

## THE OFFICIAL CAPACITY CLAIM AGAINST KEVIN MOORE MUST BE DISMISSED

Deputy Administrator Kevin Moore retired on January 15, 2018. He has not been replaced. The Deputy Administrator position remains vacant. The official capacity claim should be dismissed. Silver v Cheektowaga Central School District 2014 WL 12656105 (WDNY 2014).

BROOME COUNTY ATTORNEYS OFFICE • BROOME COUNTY OFFICE BUILDING
GOVERNMENT PLAZA • BINGHAMTON, N.Y. 13901

**CONCLUSION**

**THE PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION
MUST BE DENIED**

Dated: March 5, 2018
       Binghamton, NY

                                          ROBERT G. BEHNKE
                                          Broome County Attorney
                                          Bar Roll No. 101121
                                          Broome County Attorney's Office
                                          Edwin L. Crawford County Office Bldg.
                                          PO Box 1766
                                          60 Hawley Street
                                          Binghamton, NY  13902-1766
                                          (607) 778-2117

BROOME COUNTY ATTORNEYS OFFICE • BROOME COUNTY OFFICE BUILDING
GOVERNMENT PLAZA • BINGHAMTON, N.Y. 13901