UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

A.T., a minor, by and through
his parent and natural guardian
Shakeema Tillman, and B.C.,
a minor, by and through Kristi
Cochardo,

                              Plaintiffs,


                -v-                                9:17-CV-817

DAVID HARDER, Broome
County Sheriff, in his official
capacity, MARK SMOLINSKY,
Jail Administrator of the
Broome County Correctional
Facility, in his official capacity,
and KEVIN MOORE, Deputy
Administrator, in his official
capacity,

                              Defendants.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                           OF COUNSEL:

LEGAL SERVICES OF CENTRAL NEW YORK     JOSHUA T. COTTER, ESQ.
Attorneys for Plaintiffs                     SAMUEL C. YOUNG, ESQ.
221 South Warren Street, Suite 300         SUSAN M. YOUNG, ESQ.
Syracuse, NY 13202

LEGAL SERVICES OF CENTRAL NEW YORK     GEORGE B. HADDAD, ESQ.
Attorneys for Plaintiffs
168 Water Street
Binghamton, NY 13901

BROOME COUNTY ATTORNEY'S OFFICE        ROBERT G. BEHNKE, ESQ.
Attorneys for Defendants
Broome County Office Building
60 Hawley Street, P.O. Box 1766
Binghamton, NY 13902

DAVID N. HURD
United States District Judge

## **TABLE  OF  CONTENTS**

I.      INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      3

II.     BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      4
        A.      The Broome County Jail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      5
        B.      Solitary Confinement at the Jail. . . . . . . . . . . . . . . . . . . . . . . . . . . .      5
        C.      Andrea Weisman, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      6
        D.      Defendants' Opposition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      7
                1.      Proposed Regulatory Amendment . . . . . . . . . . . . . . . . . . . . . .      7
                2.      Reports from Supervisory or Accrediting Bodies. . . . . . . . . . .      8
                3.      Affidavits from Broome County Jail Staff . . . . . . . . . . . . . . . . . . .      8
                        i.      Sean Bell. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      8
                        ii.     James Borchardt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      9
                        iii.    Marcus DeAngelo. . . . . . . . . . . . . . . . . . . . . . . . . . . . .      9
                        iv.     Jeff Katen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      9
                        v.      Jason Kirk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      10
                        vi.     Dennis Rowe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      10
                        vii.    Daniel Snyder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      10
                        viii.   Jennifer Vasquez. . . . . . . . . . . . . . . . . . . . . . . . . . . . .      11
                        ix.     Adam Wilcox. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      11

III.    DISCUSSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11
        A.      Class Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     12
                1.      Numerosity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     15
                2.      Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18
                3.      Typicality.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     20
                4.      Adequacy of Representation. . . . . . . . . . . . . . . . . . . . . . . . .     22
                5.      Rule 23(b).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     24
                6.      Ascertainability. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25

        B.      Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     25
                1.      Substantial Likelihood of Success. . . . . . . . . . . . . . . . . . . . . .     27
                        i.      Deliberate Indifference to Conditions of Confinement. . . . . . . .     27
                        ii.     Fourteenth Amendment Due Process & the IDEA. . . . . . . . . .     34
                        iii.    The ADA & Section 504. . . . . . . . . . . . . . . . . . . . . . . . . . . .     35
                2.      Strong Showing of Irreparable Harm. . . . . . . . . . . . . . . . . . . . .     36
                3.      Public Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37
                4.      Balance of Hardships. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

IV.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     37

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

Named plaintiffs A.T. and B.C.[1] seek declaratory and injunctive relief on behalf of themselves and a proposed class of fellow 16- and 17-year-olds ("juveniles") who have been or will be held in some form of solitary confinement at the Broome County Correctional Facility (the "Broome County Jail" or the "Jail").

The Broome County Jail is operated by defendants Broome County Sheriff David Harder ("Sheriff Harder"), Jail Administrator Mark Smolinsky ("Administrator Smolinsky"), and Deputy Jail Administrator Kevin Moore ("Deputy Administrator Moore") (collectively "defendants"), each of whom is sued here in their official capacity.[2]

Plaintiffs' first amended complaint asserts five claims. In the first and second causes of action, they assert 42 U.S.C. § 1983 claims alleging defendants routinely place juveniles in solitary confinement and then deny them access to educational opportunities in violation of the Eighth and Fourteenth Amendments (the proposed "juvenile class").

In plaintiffs' third cause of action, they assert a claim under the Individuals with Disabilities in Education Act ("IDEA") alleging a subclass of juveniles placed in solitary confinement are being denied the special education and related support services to which they are entitled under the statute (the proposed "IDEA subclass").

---

[1] The named plaintiffs are (or were at the time of filing) minors. They appear here through their parents or natural guardians and are referred to by their initials in accordance with FED. R. CIV. P. 5.2.

[2] Initially, plaintiffs also sued the Chenango Valley Central School District. However, plaintiffs settled their claims against the School District in an order approved on February 9 and stipulated to an agreement on attorney's fees in an order approved on March 6. As of March 7, the School District has been terminated as a defendant in this action.

In plaintiffs' fourth and fifth causes of action, they assert claims under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") alleging a separate subclass of qualifying juveniles are being denied access to certain programs, services, and benefits without first receiving the individualized assessment mandated by these federal laws (the proposed "disability subclass").

Plaintiffs have moved for class certification under Federal Rule of Civil Procedure ("Rule") 23.  Plaintiffs have also moved for a preliminary injunction under Rule 65.  Defendants oppose both requests.  The parties have exchanged limited discovery on an expedited basis and the motions were fully briefed in advance of oral argument, which was heard on March 23, 2018 in Utica, New York.  Decision was reserved.

## II. **BACKGROUND**

Plaintiffs have submitted declarations and other evidence in support of their request for class certification, <u>see</u> Cotter Class Cert. Decl. (detailing supporting submissions), and in support of their motion for preliminary injunctive relief, <u>see</u> Cotter Prelim. Inj. Decl. (same); Weisman Decl. (including supporting exhibits).

In opposition, defendants have submitted selected records from current or former members of the proposed juvenile class, <u>see</u> Behnke Class Cert. Aff. (detailing submissions), information about proposed regulatory changes, Behnke Prelim. Inj. Decl. Ex. A, reports from the New York State Commission of Correction and the National Commission on Correctional Health Care, Behnke Prelim. Inj. Decl. Exs. B & C, and a series of two- and three-page affidavits from Broome County Jail staff members Sean Bell, James Borchardt, Marcus DeAngelo, Jeff Katen, Jason Kirk, Dennis Rowe, Daniel Snyder, Jennifer Vasquez, and Adam Wilcox.

All of these materials have been considered and the particularly relevant portions will be summarized below.  Notably, however, neither party has sought an evidentiary hearing in connection with either of plaintiffs' motions, and an independent review of the submissions has not revealed any genuine disputes over the facts essential to resolve the pending requests.  See, e.g., Matter of Defend H2O v. Town Bd. of the Town of E. Hampton, 147 F. Supp. 3d 80, 96-97 (E.D.N.Y. 2015) (discussing circumstances where an evidentiary hearing on a preliminary injunction may prove unnecessary).  Accordingly, while disputes over certain factual matters remain outstanding, their resolution is unnecessary at this juncture.

**A.  The Broome County Jail**

The Broome County Jail is a 563-bed correctional facility located in Dickinson, New York that houses pre-trial detainees, convicted individuals serving sentences, and technical parole violators.  The Jail primarily holds an adult inmate population.  However, the facility is also used to house juveniles, many of whom suffer from mental health or intellectual disabilities.

Generally speaking, juveniles being held at the Broome County Jail are housed in their own pod ("F-Pod"), where they are permitted outside their cells for about 12 hours a day for recreation, showers, library use, class time, and other programming.  The average length of time a juvenile spends at the Jail is 37 days, and the vast majority of the juveniles held at the Jail are pre-trial detainees.

**B.  Solitary Confinement at the Jail**

Defendants' policies contemplate several different forms of disciplinary isolation or segregation:  (1) "informal discipline," where an inmate waives the right to a hearing and simply accepts the corrections officer's proposed sanction, which is usually a 24-hour period

of confinement in a cell; (2) "administrative segregation," where an inmate is confined to their cell or to the Secure Housing Unit ("SHU") for up to 15 business days pending a disciplinary hearing; (3) "protective custody," a form of administrative segregation that can exceed the 15-day limit; and (4) "disciplinary segregation" or "keep-lock," an additional period of lock-in or SHU time imposed as a punitive measure.

In each instance, the inmate is confined to a sparsely furnished cell measuring about 8 by 10 feet for approximately 23 hours a day.  Plaintiffs contend these measures are routinely imposed by Broome County Jail staff on members of the proposed juvenile class regardless of mental health history and even for minor misbehavior, such as horseplay, engaging in a water fight, tossing paper into a waste basket, or failing to clean their cell to a guard's satisfaction.  Plaintiffs assert that once a juvenile is placed in any of these forms of solitary confinement, defendants deny them access to education or special education instruction and related support services in violation of state and federal law.

In addition, plaintiffs contend the Broome County Jail's practices and policies fail to distinguish between adults and juveniles, between pre-trial detainees and post-conviction prisoners, or even between normal juveniles and those with mental or intellectual disabilities.  As a result, juveniles at the Jail often come in visual or physical contact with members of the adult inmate population, who among other things have been known to try to attack them, to throw urine at them, and to shout threatening messages to them.

### C. Andrea Weisman, Ph.D

In support of their request for preliminary relief, plaintiffs have submitted a detailed declaration from Andrea Weisman, Ph.D., a licensed clinical psychologist.  Dr. Weisman visited the Broome County Jail, interviewed two of the five juveniles being held there at the

time of her visit, reviewed the Jail's written policies, examined the records of various juveniles who were held at the facility, and interviewed various members of the Jail staff.

Dr. Weisman opines in relevant part that "the policies and practices guiding the placement of youth in solitary confinement are extraordinarily harsh and are extremely damaging to youth so confined" and concludes that defendants' "adherence to these policies place all juveniles who are, or will be, incarcerated at the Jail at substantial risk of serious harm."

### D. Defendants' Opposition

Defendants' submissions can be divided into three categories:  (1) an explanation of the salient features of a proposed amendment to state corrections law; (2) reports from supervisory or accrediting bodies; and (3) a series of short affidavits from Broome County Jail staff members offering context for defendants' penological decision-making vis-à-vis certain juveniles who have submitted declarations in support of plaintiffs' pending requests for relief or who are otherwise involved in this litigation.

### 1. Proposed Regulatory Amendment

On November 1, 2017, the New York State Commission of Corrections proposed certain amendments to the current regulations "regarding inmate cell confinement and essential services deprivation."  According to defendants, these proposed changes will "require any disciplinary or administratively segregated inmate who is under eighteen years of age [to be] allowed out of their cell for a minimum of four hours per day."

Under the proposal, this four-hour requirement is not in stone but rather may be denied to a juvenile any time the "chief administrative officer determines that [ ] denial is necessary to preserve the safety, security or good order of the facility."  The proposed

changes will provide for weekly review of this kind of denial, which must also be memorialized in writing and maintained in a centralized database.

In addition, the proposed regulations permit facility staff to restrict or even deny educational services to juveniles provided that the denial is reviewed by the chief administrative officer "within one school day and every school day thereafter while such restriction or denial is in effect."

### 2. Reports from Supervisory or Accrediting Bodies

Defendants submitted two reports in an attempt to rebut certain of plaintiffs' claims. First, defendants submitted a February 14, 2018 New York State Commission of Correction Report entitled "The Worst Offenders." As defendants explain, this report does not include the Broome County Jail even though Dr. Weisman opined in her report that the Jail was "the worst facility she has seen in her thirty years." Second, defendants submitted a September 25, 2017 accreditation report from the National Commission on Correctional Health Care ("NCCHC"). According to defendants, this submission establishes that the Broome County Jail is in compliance with NCCHC standards for "restraint and seclusion."

### 3. Affidavits from Broome County Jail Staff

#### i. Sean Bell

Officer Bell states that he currently works in D-pod, the SHU. He asserts that inmates in the SHU "are able to exercise and jog around the perimeter of the yard." In addition, Officer Bell explains SHU inmates have access to legal papers and a bible during the first 24 hours in the SHU. After that, they are "permitted three books and three magazines in their cells." These inmates also have "daily access to three newspapers" if they want to read them. According to Officer Bell, he passes the newspapers "from cell to cell each day so any

inmate who signs up for a paper has the opportunity to read it."

Officer Bell denies ever assaulting any inmates or witnessing any corrections officer assault any inmate in his presence.  To the contrary, Officer Bell claims that A.T., one of the named plaintiffs, "would target any new person" in SHU and has previously assaulted another inmate.  According to Officer Bell, he also observed D.K., another juvenile, "throw urine through the window of an adult's cell in F-pod" while the adult inmate was asleep.  Officer Bell states that he did not observe any adult inmates harassing any juveniles, and opines that juveniles "were more likely" to harass the adults.

### ii.  James Borchardt

Officer Borchardt is the Inmate Grievance Coordinator at the Broome County Jail.  He explains that inmates are free to file grievances and appeal any decisions he makes, but asserts that "[n]o juvenile inmates have filed a grievance regarding the issues raised in this litigation."

### iii.  Marcus DeAngelo

In his affidavit, Officer DeAngelo explains that he penalized C.J., a juvenile inmate, with "seven day keeplock" after he refused to "stand for a count."  According to Officer DeAngelo, C.J. claimed he was going to the bathroom but "was observed sitting on the toilet with his pants up."  Officer DeAngelo explains that C.J. was also uncooperative on other occasions "during the count."  Further, Officer DeAngelo denies ever observing C.J. talking to himself or asking for help with his worksheets.  Finally, Officer DeAngelo asserts that he never witnessed any inmates "spying on the juveniles in the shower."

### iv.  Jeff Katen

Officer Katen's affidavit confirms Officer Bell's claim that an inmate is not permitted to

have anything other than legal materials and religious belongings during the first 24 hours they spend in SHU.  Officer Katen also recounts an incident with D.K., who was placed in keeplock because "he informed the staff his listed birth date was wrong."  According to Officer Katen, staff placed D.K. in keeplock so they could investigate this claim.

### v. **Jason Kirk**

Officer Kirk recounts an instance in which he was present for a "shakedown" in F-pod.  According to him, O.C., a juvenile, was restrained because he refused to "put his head down" and became argumentative.  Officer Kirk states that named plaintiffs A.T. and B.C. were "given multiple chances . . . to comply with facility rules" but repeatedly violated them.  Like Officer DeAngelo, Officer Kirk denies being informed "of any complaints that the adults were watching the juveniles in the shower."  Officer Kirk also denies ever observing any adults throwing urine or feces on the cell walls.

### vi. **Dennis Rowe**

Like Officer Kirk, Sergeant Rowe recalls the "shakedown" where O.C. refused to comply, but adds to it by denying that Jail staff "slammed" O.C.'s head on the floor.  As with Officer Bell, Sergeant Rowe opines that the juveniles are the instigators of any harassment involving the adults.  Finally, Sergeant Rowe denies hearing any complaints about adult inmates watching juveniles in the showers.

### vii. **Daniel Snyder**

Officer Snyder offers information about the discrepancy with D.K.'s date of birth described in Officer Katen's affidavit.  According to Officer Snyder, he was instructed to lock D.K. in his cell until they could confirm his date of birth—it took seven days of keeplock to confirm that D.K. was, in fact, correct about his own date of birth.  Nevertheless, Officer

Snyder explains that this was necessary for D.K.'s protection and for the protection of other inmates. Finally, Officer Snyder denies ever observing any adults threatening juveniles.

### viii. **Jennifer Vasquez**

Officer Vasquez recounts an incident on November 23, 2016 with O.C., who "persistently continued to make noise and was screaming" between the hours of one and two in the morning. Officer Vasquez concluded that O.C. "was being intentionally disruptive and seeking a physical altercation with an officer." After O.C. refused to comply with various commands, staff removed him from F-pod.

### ix. **Adam Wilcox**

Officer Wilcox's familiarity with the "shakedown" of O.C. comes through his review of incident reports. According to Officer Wilcox, staff needed to control O.C.'s head for his own protection and for the protection of other corrections officers. Officer Wilcox, like several other officers, denies ever observing any adults "spying on the showers." In addition, Officer Wilcox explains that inmates are only "shackled in the recreation yard" if they are "a threat to themselves or another inmate or officer."

## III.  **DISCUSSION**

The fact pattern and procedural posture presented in this case are remarkably similar to a matter addressed just last year in V.W. v. Conway, 236 F. Supp. 3d 554 (N.D.N.Y. 2017) ("Conway"). There, the named plaintiffs were juveniles who sought relief on behalf of themselves and a proposed class of minor detainees suffering virtually identical treatment at the hands of Onondaga County officials. After plaintiffs' requests for class certification and preliminary injunctive relief were granted, the parties entered into an interim agreement before negotiating the terms of a final class action settlement.

The parties to the present case are well familiar with Conway.  Plaintiffs' counsel in this action successfully litigated the Conway matter, and they have relied heavily on the reasoning and conclusions set forth in Conway in making the requests for class certification and preliminary injunctive relief that are under consideration now.  At oral argument, defendants were tasked with articulating how the facts of this case could be understood to give rise to the kind of meaningful distinctions that might ultimately warrant a series of legal conclusions different from those reached in Conway.  Defendants struggled to do so, and for good reason:  a careful review of the parties' submissions makes it clear that justice is best served by treading Conway's path.

## A.  Class Certification

Plaintiffs seek to certify (1) a class composed of "[a]ll 16- and 17-year-olds who are now or will be incarcerated at the Broome County Correctional Facility"; (2) a subclass of "[a]ll 16- and 17-year-olds with disabilities, as defined by the Individuals with Disabilities Education Act, who are now or will be incarcerated at the Broome County Correctional Facility, who are in need of special education and related services"; and (3) a subclass of "[a]ll 16- and 17-year-olds with psychiatric and/or intellectual disabilities, as defined by the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973, who are now or will be incarcerated at the Broome County Correctional Facility, who are at risk of being placed in disciplinary segregation because of their disability."  Pls.' Mem. Supp. Class Cert. at 12.[3]

"A district court enjoys broad discretion when it comes to resolving questions of class

---

[3]  Pagination corresponds to CM/ECF.

certification because it 'is often in the best position to assess the propriety of the class and has the ability, . . . , to alter or modify the class, create subclasses, and decertify the class whenever warranted.'" Conway, 236 F. Supp. 3d at 572 (quoting Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd., 262 F.3d 134, 139 (2d Cir. 2001)).

However, because the class action device is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," Califano v. Yamasaki, 442 U.S. 682, 700-01 (1979), "[a] party seeking class certification must *affirmatively* demonstrate [its] compliance with the Rule." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011) (emphasis added) ("Rule 23 does not set forth a mere pleading standard.").

Accordingly, "the district court is required to make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement." Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010) (quoting In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006) ("In re IPO")).[4]

First, Rule 23 requires a party seeking certification to demonstrate that:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect

---

[4] At this stage, the merits should be considered only to the extent they overlap with Rule 23's inquiry. Dukes, 564 U.S. at 351 ("Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped.").

the interests of the class.

FED. R. CIV. P. 23(a).

Second, the Rule requires a party to satisfy at least one of three additional requirements:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FED. R. CIV. P. 23(b).

Finally, courts have written a third, "implied requirement" into the Rule: a party seeking certification must demonstrate that the proposed class is "ascertainable." Sykes v. Mel Harris & Assocs., LLC, 285 F.R.D. 279, 287 (S.D.N.Y. 2012). Under this additional element, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." Stinson v. City of N.Y., 282 F.R.D. 360, 367 (S.D.N.Y. 2012) (quoting In re

- 14 -

Fosamax Prods. Liab. Litig., 248 F.R.D. 389, 395 (S.D.N.Y. 2008)).

In sum, "[c]lass certification is appropriate where the proposed class meets, by a preponderance of the evidence following a court's 'rigorous analysis,' the requirements of Rule 23(a) and the proposed class constitutes one of the types of classes enumerated in Rule 23(b)." Stinson, 282 F.R.D. at 367 (citation omitted).

## 1. Numerosity

The first element requires plaintiffs to demonstrate that "the class is so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1).

Ordinarily, a proposed class that exceeds forty members is considered presumptively numerous for purposes of this requirement. Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., Inc., 772 F.3d 111, 120 (2d Cir. 2014) ("Numerosity is presumed for classes larger than forty members.").

However, the Second Circuit has cautioned that "the numerosity inquiry is not strictly mathematical" but rather one that should take "into account the context of the particular case, [and] in particular whether a class is superior to joinder based on other relevant factors including:  (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) request for injunctive relief that would involve future class members." Morgan Stanley & Co., Inc., 772 F.3d at 120 (citation omitted).

In other words, "[t]he numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible—only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC, 504 F.3d 229, 244-45

(2d Cir. 2007).

Plaintiffs argue the proposed juvenile class is sufficiently numerous because the record demonstrates that at least 110 juveniles spent time at the Broome County Jail during the period between March 1, 2016 and November 1, 2017.  Waldron Decl. ¶ 5.  Defendants respond that the Jail's internal records show that in 2017 only 18 juveniles "received any form of discipline" at the Broome County Jail.  Defs.' Mem. Opp'n at 10-11.  Plaintiffs reply that defendants' proffered number is not tied to any evidence in the present record and, even if it were an accurate data point, it fails to account for the fact that the juvenile class proposed by plaintiffs is not limited to just those juveniles actually placed in some form of solitary confinement for disciplinary reasons.  Pls.' Reply Mem. at 5-6.

Plaintiffs clearly have the better of this argument.  They are correct that in circumstances such as these, courts routinely certify classes that encompass not only those members who have actually been subjected to a challenged policy or practice but also to similarly situated individuals at reasonably foreseeable risk of facing the same fate.  See, e.g., Conway, 236 F. Supp. 3d at 574 (certifying class of all juveniles held at the facility now or in the future); Hernandez v. Cty. of Monterey, 305 F.R.D. 132, 152 (N.D. Cal. 2015) (certifying class of all inmates held at the facility).

Various contextual factors also point toward the appropriateness of certification.  For instance, plaintiffs' proposed class includes all future juveniles who will be detained at the Broome County Jail, precisely the sort of revolving population that often makes joinder of individual members impracticable.  See, e.g., Clarkson v. Coughlin, 783 F. Supp. 789, 797 (S.D.N.Y. 1992) ("The class action device is particularly well-suited in actions brought by prisoners due to the 'fluid composition' of the prison population . . . [and] generally tend[s] to

be the norm in actions such as this.").

And while the juvenile class members will obviously share the same geographic area (that is, the Broome County Jail) at one point or another, the ability of any one individual member of the class to maintain an individual civil rights suit will at the same time necessarily be limited by the simple reality that their freedom has been severely restricted. Cf. Redmond v. Bigelow, 2014 WL 2765469, at *3 (D. Utah June 18, 2014) (acknowledging that individual members of a putative class of prisoners would face myriad practical difficulties in maintaining individual suits because they "enjoy very little freedom in their daily lives" such as the fact they "are not at liberty to meet and confer with counsel without permission" from prison authorities).

Finally, litigating this suit as a class action promotes judicial economy, since it avoids multiple individual suits that raise the same issues and seek the same relief—an end to current solitary confinement practices for juveniles held at the Broome County Jail, and an end to the deprivation of education and disability support services attendant to that kind of treatment. Cf. Williams v. Conway, 312 F.R.D. 248, 251 (N.D.N.Y. 2016) (McAvoy, J.) (certifying class of present and future deaf and hearing-impaired prisoners at the Justice Center).

Plaintiffs' proposed subclasses meet Rule 23's numerosity requirement for substantially the same reasons. Working from the 110 known members of the juvenile class, plaintiffs cross-reference data from the New York State Department of Education to establish that at least 51 members of the juvenile class were students with a qualifying disability under the IDEA, and rely on studies from the National Center for Mental Health and Juvenile Justice to establish that at least 55 members of the juvenile class would meet the criteria to

qualify for a disability under the ADA and Section 504.

Defendants respond that this method of estimating subclass membership cannot satisfy the numerosity standard because it is "purely speculative." But as plaintiffs reply, conclusions drawn from statistical data have been found sufficient for purposes of class certification so long as they are demonstrably reasonable ones. See, e.g., Williams, 312 F.R.D. at 252 (finding numerosity satisfied where plaintiffs offered, inter alia, estimate of class members based on statistical data cross-referenced against relevant public reports).

Upon review, that is the case here. In sum, plaintiffs have demonstrated by a preponderance of the evidence that the proposed juvenile class and the two subclasses are sufficiently numerous such that joinder of all members is impracticable. Accordingly, Rule 23's numerosity requirement is satisfied.

### 2. **Commonality**

This element requires plaintiffs to demonstrate there "are questions of law or fact common to the class." FED. R. CIV. P. 23(a)(2).

Importantly, this "does not require all questions of law or fact to be common," and "even a single common question will suffice." Sykes, 285 F.R.D. at 286; see also Marisol A. v. Giuliani, 126 F.3d 372, 377 (2d Cir. 1997) ("The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact."); Trief v. Dun & Bradstreet Corp., 144 F.R.D. 193, 198 (S.D.N.Y. 1992) ("Commonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class members.").

"The common question must lend itself to 'classwide resolution' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each

one of the claims in one stroke.'" <u>Sykes</u>, 285 F.R.D. at 286 (quoting <u>Dukes</u>, 564 U.S. at 350).  Importantly, "factual differences in the claims of the class do not preclude a finding of commonality." <u>Id</u>. at 287 (citation and internal quotation marks omitted).  Rather, what matters is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." <u>Id</u>. at 286 (citation and internal quotation marks omitted).

Plaintiffs' submissions establish that they have also met their burden on this element.  <u>See</u> Pls.' Mem. Supp. Class Cert. at 16-22 (setting forth evidence in support of the commonality inquiry in detail).  Defendants' opposition submission is shot through with attempted explanations for the different reasons that individual juveniles were placed in solitary confinement and/or descriptions of the different circumstances in which such confinement was imposed.  But much of that is beside the point.

More importantly for purposes of evaluating this element is the fact that plaintiffs allege defendants have engaged in a common course of unlawful conduct toward members of the proposed class and subclasses, that defendants acted with deliberate indifference to the substantial risk of serious harm posed by certain aspects of that common course of conduct, and that defendants have collectively deprived class and subclass members of the education, special services, and other related procedural protections to which they are entitled.

As in <u>Conway</u>, "the common answers to these questions will drive the resolution of the litigation—whether defendants' conduct violates the Constitution or federal law, and whether defendants should therefore be enjoined from engaging in that course of conduct."  236 F. Supp. 3d at 575 (collecting cases); <u>see also, e.g.</u>, <u>Williams</u>, 312 F.R.D. at 253 (finding commonality requirement satisfied based on "jail's alleged failure to provide

class members with services for the deaf and hearing-impaired" because these grievances share a common question of law or fact and arise from the same course of events). In sum, plaintiffs have demonstrated by a preponderance of the evidence that there are questions of law or fact common to the class and the subclasses.

### 3. Typicality

This requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).

"Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar arguments to prove the defendant's liability." Stinson, 282 F.R.D. at 370-71 (citation omitted). "When the same unlawful conduct was directed at or affected both the named plaintiffs and the prospective class, typicality is usually met." Id. at 371. Generally speaking, minor variations in the fact patterns underlying the individual claims will not preclude a finding of typicality unless there are "unique defenses" that threaten to become the focus of the litigation. See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 59 (2d Cir. 2000).

Plaintiffs have carried their burden on this element for substantially the same reasons as set forth above—the members of the proposed class and subclasses share the same legal arguments because their claims are based on the common application of certain challenged policies. Sykes, 285 F.R.D. at 287 ("The commonality and typicality requirements of Rule 23(a) tend to merge such that similar considerations inform the analysis for both prerequisites."); see also e.g., Butler v. Suffolk Cty., 289 F.R.D. 80, 99 (E.D.N.Y. 2013) (finding typicality satisfied where, for example, "whether exhaustion should be excused because administrative remedies were unavailable . . . is a question common to all members

of the class").

Defendants argue that typicality cannot be satisfied in this case "because the claims of A.T. and B.C. are moot and they have failed to exhaust their administrative remedies." Defs.' Opp'n Mem. at 12. According to defendants, these are unique defenses that will be "an important focus of the litigation." Id.

These arguments are rejected as bases to defeat class certification. As plaintiffs point out in reply, defendants' claim of mootness appears based on a colloquial usage of the term rather than an attempt at setting forth, much less satisfying, the formal legal standard presumably being referenced. But even assuming for present purposes that defendants are correct, it adds little to the certification inquiry because the inherently transitory nature of the pre-trial detention setting brings this matter within the "narrow class of cases in which the termination of a class representative's claim does not moot the claims of the unnamed members of the class." Gerstein v. Pugh, 420 U.S. 103, 110 n.1 (1975); see also Williams, 312 F.R.D. at 254.

Defendants' exhaustion argument fares no better. They contend the named plaintiffs have failed to comply with administrative exhaustion requirements. Although it is left uncited in their brief, this is apparently a reference by defendants to the requirement set forth in the Prison Litigation Reform Act ("PLRA"). The PLRA provides in relevant part that: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

Importantly, though, failure to exhaust is an affirmative defense and therefore "inmates are not required to specifically plead or demonstrate exhaustion in their

complaints." <u>Jones v. Bock</u>, 549 U.S. 199, 216 (2007).  Accordingly, "exhaustion may be excused if:  (1) administrative remedies were unavailable; (2) the defendants forfeited the defense or acted in such a way as to estop them from raising it; or (3) 'special circumstances' justify non-exhaustion." <u>Butler</u>, 289 F.R.D. at 93 (quoting <u>Hemphill v. New York</u>, 380 F.3d 680, 686 (2d Cir. 2004)).  As the Supreme Court recently explained, "an administrative procedure is unavailable when, (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." <u>Ross v. Blake</u>, 136 S. Ct. 1850, 1859 (2016).

In this case, the named plaintiffs and others have introduced declarations specifically attesting that their requests to see the Jail's grievance officer went unanswered, and on a few occasions they were told that certain issues about which they sought to complain were not grievable at all.  In the face of these specific assertions, Officer Borchardt's short, blanket affidavit essentially claiming that no grievances from any juveniles have happened to reach his desk is woefully insufficient to defeat certification at this stage of the proceedings.

In sum, plaintiffs have demonstrated by a preponderance of the evidence that the claims or defenses of the representative parties are typical of the claims or defenses of the class and the subclasses.

### 4.  Adequacy of Representation

This requirement is satisfied if "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4).

"[T]he adequacy requirement is twofold:  the proposed class representative must have an interest in vigorously pursing the claims of the class, and must have no interests antagonistic to the interests of other class members." <u>Denney v. Deutsche Bank AG</u>, 443

F.3d 253, 268 (2d Cir. 2006).  In addition, class counsel must be "qualified, experienced and able to conduct the litigation."  <u>Baffa</u>, 222 F.3d at 60.

This inquiry "serves to uncover conflicts of interest between the parties and the class they seek to represent."  <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997).  "Not every conflict, however, precludes a finding of adequacy."  <u>Sykes</u>, 285 F.R.D. at 287.  "The conflict that will prevent a plaintiff from meeting the Rule 23(a)(4) prerequisite must be fundamental, and speculative conflict should be disregarded at the class certification stage."  <u>Id</u>. (citation omitted).

"In order to defeat class certification, there must be a showing of a genuine conflict between the proposed class representative's interests and those of the other members of the class, and only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status."  <u>Stinson</u>, 282 F.R.D. at 371 (quoting in part <u>Hirschfeld v. Stone</u>, 193 F.R.D. 175, 183 (S.D.N.Y. 2000) (internal citation and quotation marks omitted)).

Plaintiffs have also carried their burden here.  Defendants' principal argument on this element is that "potential conflicts" exist because A.T. and B.C. "were disciplined for fighting with each other" while being detained at the Broome County Jail.  Defs.' Opp'n Mem. at 12. But as plaintiffs point out, that kind of interpersonal conflict does not go to "the very subject matter of the litigation," which for reminder's sake is not the abandonment of measures that might result in safety and good order at the Jail but rather the question of whether the widespread use of solitary confinement on the Jail's juvenile population is a legally permissible shortcut toward achieving that end.

As discussed above, the representatives of the class and the subclasses have been

subjected to the same common course of treatment by the same officials on the basis of the same policies.  Each named plaintiff has expressed a clear desire to seek prospective injunctive relief from these policies.  That outcome will benefit the other juveniles currently detained at the Broome County Jail, and it will also benefit the juveniles who will be held at the Jail in the future.

Further, class counsel have extensive litigation experience in the class action context and in effectively seeking classwide injunctive relief in federal forums.  See, e.g., Conway, 236 F. Supp. 3d at 577 (collecting cases).  Accordingly, plaintiffs have demonstrated by a preponderance of the evidence that the representative parties will fairly and adequately protect the interests of the class and the subclass.

### 5. **Rule 23(b)**

Plaintiffs also satisfy this requirement.  They rely on Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2).

"The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  Dukes, 564 U.S. at 360.

The members of the class and the subclasses would benefit from the same remedy—an order enjoining defendants from application of the policies and practices resulting in the deprivations at issue.  Dukes, 564 U.S. at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.").  Accordingly, plaintiffs have met their burden on this element.

### 6. Ascertainability

Plaintiffs have also satisfied this final requirement.  Among other things, the members

of both the class and the subclasses are readily identifiable pursuant to objective criteria,

such as records maintained by defendants.  In sum, plaintiffs have affirmatively

demonstrated their compliance with each of the requirements for class

certification.  Accordingly, plaintiffs' motion for class certification will be granted.

### B. Preliminary Injunction

Plaintiffs contend preliminary injunctive relief is warranted in this case for substantially

the same reasons it was justified in Conway.  According to plaintiffs, defendants routinely

place teenagers being held at the Broome County Jail in various forms of solitary

confinement, exposing them to the sort of extreme conditions that pose a serious risk of

substantial harm to a segment of the Jail's population that is already vulnerable.

Plaintiffs emphasize that policy makers in the federal government and in 21 states

around the country have abandoned this practice precisely because the risks of serious harm

far outweigh any countervailing considerations.  Plaintiffs point to a large and growing body

of research that confirms the use of solitary on juveniles is actually counterproductive to the

penological goals of facility safety and security.

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Gen.

Mills, Inc. v. Chobani, LLC, 158 F. Supp. 3d 106, 114 (N.D.N.Y. 2016) (quoting Winter v. Nat'l

Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).  "The party seeking the injunction carries the

burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are

satisfied."  Reckitt Benckiser Inc. v. Motomco Ltd., 760 F. Supp. 2d 446, 452 (S.D.N.Y. 2011)

(quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

As a general matter, the party seeking preliminary relief must show:  "(1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest."  Gen. Mills, Inc., 158 F. Supp. 3d at 115; see also Chobani, LLC v. Dannon Co., Inc., 157 F. Supp. 3d 190, 199 (N.D.N.Y. 2016).

However, in cases like this one, where the movant is not seeking to restore the *status quo ante* but rather requesting an order that commands an affirmative act or mandates a specific course of conduct, a heightened standard applies:  this type of preliminary injunction should issue *only* "upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief."  Cacchillo v. Insmed, Inc., 638 F.3d 401, 406 (2d Cir. 2011) (citation omitted); see also N.Y. ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (requiring a "clear" or "substantial" likelihood of success as well as a "strong showing" of irreparable harm); N.J. v. New York, 872 F. Supp. 2d 204 (E.D.N.Y. 2011) ("This higher standard is particularly appropriate when a plaintiff seeks a preliminary injunction against a government body such as a school district.").

"In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of [ ] prisons."  Fisher v. Goord, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing Farmer, 511 U.S. at 846-47).  Under the PLRA, preliminary injunctive relief in any civil action with respect to prison conditions must be narrowly drawn, extend no further than necessary to correct the harm, and be the least intrusive means necessary to correct that harm.  See 18 U.S.C. § 3626(a)(2)).  In

considering a request for injunctive relief, a court must give "substantial weight" to any adverse impact on public safety or the operation of a criminal justice system the relief might have. § 3626(a)(1)(A).

## 1. Substantial Likelihood of Success

Plaintiffs assert three kinds of claims:  first, they allege defendants' routine use of solitary confinement on juveniles violates the Eighth and Fourteenth Amendments; second, they allege defendants deny juveniles in solitary confinement the minimum educational instruction guaranteed by state law in violation of the Fourteenth Amendment and the special education services and other procedural protections to which they are entitled under the IDEA; and third, they allege defendants categorically deny disabled juveniles access to available programs, services, and benefits by placing them in solitary confinement without performing the individualized assessment mandated by federal law.

### i. Deliberate Indifference to Conditions of Confinement

Generally speaking, a plaintiff asserting a § 1983 claim based on the allegedly unconstitutional conditions of his or her confinement must show that:  "(1) objectively, the deprivation . . . was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind . . . , such as deliberate indifference to inmate health or safety." Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013).  The objective element requires a plaintiff to "show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." Id.  The subjective element requires a plaintiff to show the prison official knew of, and disregarded, "an excessive risk to inmate health or safety." Id.

This relatively straightforward standard has always applied to evaluate a § 1983 claim

brought by a *convicted* inmate serving a sentence.  And in 2009, the Second Circuit instructed lower courts that this same standard should apply to *pre-trial* detainees challenging the conditions of their confinement.  Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009) ("Claims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth [which protects convicted prisoners] or Fourteenth [which protects citizens detained pending trial] Amendment.").

But that is no longer the case.  Recently, the Second Circuit overruled its holding in Caiozzo "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment."  Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017) (footnote omitted).  In Darnell, the Second Circuit modified the "subjective prong" of the deliberate indifference analysis for pre-trial detainees, explaining it should be "defined objectively."  849 F.3d at 35.  In other words, a pre-trial plaintiff can now succeed on a § 1983 conditions-of-confinement claim in the Second Circuit by showing defendants "knew, or should have known, that the condition posed an excessive risk to health or safety."  Id.

In this case, as in Conway, the vast majority of the class members are pre-trial detainees and thus entitled to the more protective version of this standard.  However, in this case, as in Conway, plaintiffs seek to establish their entitlement to injunctive relief using the more inclusive, and more stringent, Eighth Amendment standard.

Under this version of the standard, "there is no' static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'"  Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012)

(quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).  As relevant here, prisoners may not be exposed "to conditions that 'pose an unreasonable risk of serious damage to [their] future health.'"  Id. (quoting Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)).

The subjective element requires a plaintiff to show "that the defendant acted with more than mere negligence."  Farmer, 511 U.S. at 835.  "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'"  Walker, 717 F.3d at 125 (quoting Jabbar, 683 F.3d at 57); see also Lapierre v. Cty. of Nassau, 459 F. App'x 28, 29 (2d Cir. 2012) (summary order) ("Subjectively, the official charged with deliberate indifference must have acted with the requisite state of mind, the equivalent of criminal recklessness").

For instance, "[e]vidence that the risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk."  Walker, 717 F.3d at 125 (quoting Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003)).  In addition, conduct that is not "reasonably calculated to restore prison discipline and security" may also be considered.  Trammell v. Keane, 338 F.3d 155, 163 (2d Cir. 2003); see also Crawford v. Cuomo, 796 F.3d 252, 257-58 (2d Cir. 2015) (drawing distinction between good-faith efforts to maintain or restore discipline and conduct undertaken for the purpose of causing harm).

Plaintiffs contend they are substantially likely to succeed on the merits of this claim by offering the same rationales accepted in Conway:  *objectively*, that juveniles are developmentally vulnerable, that placing them in close proximity to adult inmates presents a risk of physical and emotional harm, and that states and the federal government are

abandoning the practice nationwide; and *subjectively*, that Broome County Jail officials have been on actual notice of the serious risks of harm through complaints from juveniles, through this litigation, and through their own accrediting agency, which has disapproved of the use of solitary confinement on juveniles.

Plaintiffs are correct.  Their submissions convincingly demonstrate that juveniles face an objectively sufficiently serious risk of harm from the solitary confinement practices at the Broome County Jail.  They have also identified substantial, compelling evidence in support of a finding that defendants are specifically aware of, and have consciously chosen to disregard, the serious risk of harm posed by the solitary confinement practices as they relate to juveniles at the facility.

As plaintiffs establish, there is a broad and growing consensus among the scientific and professional community that juveniles are psychologically more vulnerable than adults.  See, e.g., Graham v. Florida, 560 U.S. 48, 68 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.");  Roper v. Simmons, 543 U.S. 551, 569 (2005) (recognizing the "comparative immaturity and irresponsibility of juveniles).

The Supreme Court has continued to stress that these fundamental differences are consequential in the Eighth Amendment context.  See, e.g., Miller v. Alabama, 132 S. Ct. 2455 (2012) (observing that youth "is a moment and condition of life when a person may be most susceptible to influence and to psychological damage").  For instance, the Court has forbidden the imposition of the death penalty on juveniles, Roper, 543 U.S. at 578, concluded that juveniles cannot be sentenced to life without parole for offenses short of homicide, Graham, 560 U.S. at 82, and held that, even in cases of homicide, juveniles cannot be

subjected to a mandatory sentencing scheme that automatically imposes a sentence of life without parole.  Miller, 132 S. Ct. at 2475.

Plaintiffs persuasively analogize the circumstances at issue in this case to numerous examples from around the country where courts have found that the imposition of solitary confinement violated the constitutional rights of *adult* inmates with mental conditions.  As plaintiffs' submissions demonstrate, many of the juveniles in the plaintiff class also suffer from similar, pre-existing mental conditions.

And as for all members of the class, plaintiffs' submissions further establish that the risks posed here are even greater, given that *juveniles* share the same increased vulnerability to long-term, or even permanent, psychological damage.  Cf. Peoples v. Annucci, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016) ("After even relatively brief periods of solitary confinement, inmates have exhibited systems such as . . . hallucinations, increased anxiety, lack of impulse control, severe and chronic depression, . . . sleep problems, and depressed brain functioning.").  Further, the federal government and at least 21 states have prohibited the use of disciplinary isolation for juveniles (and in fact, the State of New York has also largely eliminated the practice).  Cf. Graham, 560 U.S. at 62 (considering "national consensus" in determining "contemporary values" of society).

Plaintiffs have also identified significant evidence demonstrating defendants have been on notice of the specific risks of serious risk of harm from these practices through complaints from the juveniles themselves, their own continued observations, and the fact that these practices have continued unabated despite this pending litigation.  Farmer, 511 U.S. at 846 (permitting court to consider "developments that postdate the pleadings and pretrial motions" when considering subjective culpability).  Further, plaintiffs have identified data from

other jurisdictions as well as their own expert showing that the use of disciplinary

confinement on juveniles is typically not reasonably calculated to restore prison safety and,

even when it is, disciplinary isolation undermines that goal when it continues after immediate

safety concerns have abated.

In opposition, defendants fail to overcome this substantial showing.  First, they

contend that the proposed regulations, when implemented, will address the myriad concerns

identified here.  But at least at this juncture, these proposed regulations are just

that—proposed.  It should go without saying that federal courts are not in the business of

speculating about whether a proposed regulation might pass constitutional muster.

And even if defendants were somehow in a position to submit a concrete timeline for

the good-faith implementation of every single one of the proposed changes, that proffer

would do nothing to ameliorate the substantial, ongoing risk of harm at the Jail right

now.  Further, as plaintiffs point out in reply, even perfect paper standards are meaningless if

the officials charged with implementing them decide to bend the rules.

Second, defendants cite to Hughes v. Judd, 108 F. Supp. 3d 1167 (M.D. Fla. 2015), to

argue that the line of Supreme Court precedent on which plaintiffs rely to establish that

juveniles are "constitutionally different" than adults extends only to sentencing

considerations.  See id. at 1182 (deriding the plaintiffs' argument as "catchy but insubstantial"

and concluding that "Miller says little, if anything, about the constitutional standard applicable

to juvenile detention").

However, to the extent Hughes's reasoning clashes with that set forth in Conway, it is

rejected.  See, e.g., Camreta v. Greene, 563 U.S. 692, 709 n.7 ("A decision of a federal

district court judge is not binding precedent in either a different judicial district, the same

judicial district, or even upon the same judge in a different case.").

Third, defendants contend plaintiffs cannot succeed on a claim based on "administrative classifications of pretrial detainees" because those determinations "do not give rise to a liberty interest absent evidence of an intent to punish."  Defs.' Mem. Opp'n at 12.  However, plaintiffs' persuasively argue that defendants' assertion appears to conflate the standard for a procedural claim brought by a pre-trial detainee with the kind of conditions-of-confinement due process theory being pursued here.

Fourth, defendants contend that Dr. Weisman's opinion about the conditions of the Broome County Jail is too "conclusory" and thus "should be give [*sic*] no weight."  In support of this rebuttal, defendants submitted the February 14, 2018 New York State Commission of Correction Report entitled "The Worst Offenders."  As defendants explain, this report does not include the Broome County Jail.

Even if this dispute were resolved in defendants' favor, it would add little or nothing to the relevant inquiry.  After all, the Broome County Jail might not be among the five worst facilities ever evaluated by the state's commission.  But nothing about that fact would bear on the issue of whether it was the worst facility plaintiffs' expert psychologist has ever seen in her many years of professional practice.

Finally, and relatedly, defendants' submissions seek to establish a variety of minor factual disputes surrounding the imposition of various forms of confinement on various juveniles at various times.  But as discussed at the outset, any such disagreements are immaterial to the question presented at this juncture; i.e., whether plaintiffs are substantially likely to succeed on their claim that the Jail's widespread, excessive usage of solitary confinement on juveniles is unconstitutional.  In sum, defendants' arguments are insufficient

to undermine plaintiffs' clear and persuasive showing on this claim.

### ii. **Fourteenth Amendment Due Process & the IDEA**

"In a § 1983 suit brought to enforce procedural due process rights, a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." Singh v. Joshi, 152 F. Supp. 3d 112, 124 (E.D.N.Y. 2016) (quoting Nnebe v. Daus, 644 F.3d 147, 158 (2d Cir. 2011)).

Relatedly, "[t]he IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." Conway, 236 F. Supp. 3d at 586 (citation omitted). "As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction.'" Id.

With respect to their due process claim, plaintiffs assert a constitutionally protected property interest in receiving a certain amount of minimum education under New York's Education Law. With respect to their IDEA claim, plaintiffs assert defendants routinely fail to adhere to the procedural requirements mandated by federal law, such as a "manifestation hearing," before changing a qualifying juvenile's "current placement."

These arguments are accepted for the same reasons set forth in Conway. In opposition, defendants again suggest these claims are "moot," this time by claiming they "intend to work with the School District to implement [the] settlement" reached between plaintiffs and the School District. Defs.' Mem. Opp'n at 10. But a statement of good intentions is insufficient, especially since defendants do not appear to be bound in any way by the settlement they mention. In sum, plaintiffs have demonstrated at this juncture that

they are substantially likely to succeed on the merits of these claims.

### iii.  The ADA & Section 504

 Although plaintiffs acknowledge that Broome County Jail officials have authority to "impose legitimate safety requirements necessary for the safe operation" of the facility, they contend defendants violate the ADA and Section 504 by routinely placing juveniles with disabilities in solitary confinement without ever conducting the type of "individualized assessment" of their disability that these laws require.

To establish a *prima facie* violation under either the ADA or Section 504, a plaintiff must show (1) he is a qualified individual with a disability; (2) defendant is an entity subject to the statutes; and (3) he was denied an opportunity to participate in or benefit from the defendant's services, programs, or activities, or otherwise discriminated against by reason of his disability.  Wright v. N.Y. State Dep't of Corr. & Cmty. Supervision, 831 F.3d 64, 72 (2d Cir. 2016) (holding DOCCS' "blanket ban" on use of motorized wheelchair fails to "make an individualized assessment of a disabled inmate's particular needs").

Plaintiffs contend most if not all of the behavior that leads to juveniles with disabilities being placed in solitary confinement is attributable to their adolescence, or to un- or under-treated mental health or intellectual disabilities.  Plaintiffs argue that defendants routinely place these individuals in solitary without consulting a mental health worker and without assessing whether solitary confinement is appropriate.  According to plaintiffs, "a correctional facility cannot categorically deny an inmate with a disability access to available programs, services and benefits without first performing an individualized assessment."  Pls.' Mem. Supp. Class Cert. at 24.  Upon review of the briefing, plaintiffs are also substantially likely to succeed on the merits of this claim.

## 2. <u>Strong Showing of Irreparable Harm</u>

"The showing of irreparable harm is perhaps the single most important prerequisite for the issuance of a preliminary injunction." <u>Weinstein v. Krumpter</u>, 120 F. Supp. 3d 289, 297 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). "The concept of irreparable harm has been described 'as certain and imminent harm for which a monetary award does not adequately compensate.'" <u>Donohue v. Mangano</u>, 886 F. Supp. 2d 126, 149-50 (E.D.N.Y. 2012) (quoting <u>Wisdom Import Sales Co. v. Labatt Brewing Co.</u>, 339 F.3d 101, 113-14 (2d Cir. 2003)).

As in <u>Conway</u>, plaintiffs have made such a showing here. "First, as a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights." <u>Donohue</u>, 886 F. Supp. 2d at 150. In addition, plaintiffs have submitted substantial, convincing evidence that defendants' continued use of solitary confinement on juveniles puts them at serious risk of short- and long-term psychological damage, and that the related deprivation of education services by both defendants hinders important aspects of their adolescent development. <u>See, e.g.</u>, <u>New York</u>, 872 F. Supp. 2d at 214 ("[I]nterruption of a child's schooling causing a hiatus not only in the student's education but also in other social and psychological developmental processes that take place during the child's school, raises a strong possibility of irreparable injury." (citation omitted)); <u>Cosgrove v. Bd. of Educ. of Niskayuna Cent. Sch. Dist.</u>, 175 F. Supp. 2d 375, 392 (N.D.N.Y. 2001) (McAvoy, J.) ("It is almost beyond dispute that wrongful discontinuation of a special education program to which a student is entitled subjects that student to actual irreparable harm."). Accordingly, this element weighs in favor of granting a preliminary injunction.

### 3. **Public Interest**

The public interest generally supports a grant of preliminary injunctive relief where, as here, a plaintiff has demonstrated a substantial likelihood of success on the merits and a strong showing of irreparable harm.  This interest is particularly strong where the rights to be vindicated are constitutional in nature.  Ligon v. City of N.Y., 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013) ("[T]he public interest lies with the enforcement of the Constitution.").

Plaintiffs have submitted compelling evidence to rebut defendants' conclusory assertion that facility safety and security provide an overriding justification for the current implementation of the policy and practice at issue in this case.  Plaintiffs have also clearly shown that juveniles in solitary confinement only sporadically receive the educational instruction and related disability services contemplated by state and federal law.  Accordingly, the public interest is served by the grant of a preliminary injunction.

### 4. **Balance of Hardships**

No one disputes that defendants have a strong interest in maintaining safety and security at the Broome County Jail.  But as discussed above, plaintiffs have submitted sufficient evidence to undermine defendants' assertion that safety and security are legitimately served by the current iteration of these practices when applied to juveniles.  Accordingly, the balance of hardships favors the grant of a preliminary injunction.

## IV. **CONCLUSION**

Plaintiffs have affirmatively demonstrated compliance with Rule 23's requirements and therefore the motion for class certification will be granted.  Plaintiffs have also shown a substantial likelihood of success on the merits of their claims and demonstrated that the other relevant factors weigh in their favor.  Accordingly, their request for a preliminary

injunction will also be granted.

Therefore, it is

ORDERED that

1.  Plaintiffs' motion for class certification is GRANTED;

2.  Plaintiffs' motion for a preliminary injunction is GRANTED;

3.  The official-capacity claim against Deputy Administrator Moore is DISMISSED without prejudice[5];

4.  Defendants, their agents, servants, employees, and officers, and all other persons in active concert or participation with them and who receive actual notice of this preliminary injunction, by personal service or otherwise, are hereby IMMEDIATELY ENJOINED AND RESTRAINED, pending the final determination of this action, from imposing 23-hour disciplinary isolation on juveniles at the Broome County Jail;

5.  Defendants shall IMMEDIATELY only lock juveniles in their cells for disciplinary purposes if the juvenile poses an immediate threat to the safety or security of the facility and only after less restrictive measures have been employed and found inadequate to address the particular threat at issue;

6.  Under no circumstances shall a juvenile be locked in their cell for greater than four hours for disciplinary purposes;

7.  If a juvenile remains an immediate threat to the safety and security of the facility after four hours, a psychiatrist shall be consulted and a plan put in place to ensure the

---

[5]  Defendants indicate that Deputy Administrator Moore retired on January 15, 2018.  Ordinarily, Rule 25 of the Federal Rules of Civil Procedure would provide for the automatic substitution of Deputy Administrator's Moore's successor as a defendant.  However, defendants indicate that the Deputy Administrator position at the Jail remains vacant.  If and when it is filled, defendants shall so notify the Court and plaintiffs may then move to add an official-capacity claim against the successor if appropriate.

juvenile's safe return to the general juvenile population;

     8.  Defendants shall IMMEDIATELY ensure all juveniles have access to at least three hours of educational instruction each day as well as any IDEA-mandated special education and related services; and

     9.  If a juvenile with a mental health or intellectual disability will potentially lose access to the benefits, services, and programs offered at the facility as a result of the disciplinary process, defendants shall ensure mental health staff will perform an individualized assessment of the juvenile as soon as possible.  This assessment shall at minimum include:  (a) a review of the individual's mental health needs; (b) a determination regarding whether any reasonable modifications can be made to eliminate future risk; (c) a determination regarding whether the individual with a disability continues to pose a risk; and (d) whether placement in segregation is medically appropriate.

     IT IS SO ORDERED.

Dated:  April 4, 2018
       Utica, New York.

                             United States District Judge